[No. 16948-7-II.    Division Two.    December 18, 1995.]

THE STATE OF WASHINGTON, *Respondent*, v. JAMES
ELDRED CARLSON, *Appellant*.

*Alan L. Gallagher*, for appellant (appointed counsel for appeal).

*Arthur D. Curtis, Prosecuting Attorney*, and *Kimberley Robert Farr, Deputy*, for respondent.

MORGAN, J. — James Eldred Carlson appeals his conviction for child molestation in the first degree. We reverse.

In November 1991, the State charged Carlson with molesting E, a six-year-old female. It alleged that the molestation had occurred on multiple occasions during

the first eight months of the same year. It based the charge on RCW 9A.44.083.[1]

A first trial, held in August 1992, ended in a hung jury. A second trial, the one we are now reviewing, commenced in October 1992.

At the second trial, witnesses for the State included E; E's mother; a pediatrician named Dr. Virginia Feldman; and a social worker named Shelly Sobel. Witnesses for the defense included Carlson himself. E testified that Carlson had touched her breasts, buttocks, and vaginal area underneath her clothing. Carlson denied such touching.

The jury returned a verdict of guilty, and the trial court imposed a sentence of 60 months. Carlson now appeals, raising several issues.

## I

The dispositive issue involves opinion testimony given by Dr. Feldman. She examined E on October 3, 1991. She found some abnormality in the area of the posterior fourchette,[2] but she was unable to form, based on physical findings, an opinion concerning whether E had been sexually abused. During the examination, while touching E's clitoris, she asked E

> if anyone had touched her there, that's when [E] responded yes and then [Dr. Feldman] asked whom, and [E] said [Carlson]. And then [Dr. Feldman] touched the labia minor and the rectal areas and asked [E] consecutively if anyone had touched her there, and she said no.[3]

Despite the lack of physical findings, the State questioned the doctor as follows:

---

[1]RCW 9A.44.083 provides: "A person is guilty of child molestation in the first degree when the person has . . . sexual contact with another who is less than twelve years old and not married to the perpetrator and the perpetrator is at least thirty-six months older than the victim."

[2]According to the doctor, the posterior fourchette is a part of the anatomy located near the rear of the vagina.

[3]Report of Proceedings at 719.

Q: . . . Do you have an opinion within [a] reasonable degree of medical certainty whether the findings that you observed in [E] were consistent with the history of sexual abuse that you were given?

. . . .

A: The physical findings I would say possibly not certain. In other words, I can put them in a category of compatible with and certainly possible that they got there from trauma, but I would not say on a medical certainty that's the only way that that's there.

Q: . . . [I]s the sexual history given by [E] consistent with the findings that you made, physically?

A: No, she indicated when she pointed to the clitoral area rather than to the posterior fourchette.

Q: . . . Now, do you rely upon the medical history in forming your conclusions?

A: Yes . . . . It's the exception . . . when we make a diagnosis on the basis of physical findings . . . .

Most of what I do every day is take a history, and that's usually how I . . . come to my conclusion. . . .

Q: Are you aware of a study that was done by David Jones and Melbourne McGr[a]w. . . .

A: Yes.

Q: Do you utilize that in your analysis?

A: Yes.

Q: What is that study?

A: Well, it's to try to supply a scientific method to interview. Doctors are often — much more as the laboratory tests and serum, sodium those are reliable tests or not and appear to some of Jones' work and some others who have followed him that it was. We didn't have real good criteria for looking at the interview and trying to decide is this reliable or not, and

it's vitally important since we're making our decisions on the basis of history so often.[4]

Defense counsel then objected, saying, "I don't want [Dr. Feldman] testifying about her beliefs as to [the] credibility of the child."[5] The jury was sent out, and the prosecutor questioned the doctor, in an offer of proof, about the Jones-McGraw study. When asked what the study was about, the doctor replied, according to the verbatim transcript, "[I]t's been a while since I read it, it's close to a hundred returns who had made allegations of sexual abuse, not just someone called on to see a CSD or someone about being abused." She went on to say that she had "applied those same type of standards" in the present case.[6] When asked to state the factors she had used, she listed "the children's eyes," the child's ability to remember "time, place, frequency, time of day, things, of course, that make sense to a child," "the element of secrecy," "internal consistency," "what type of emotion goes along with it," whether the child's "facial features indicate being troubled," and "the presence of a reward system where the perpetrator offers a reward."[7] The prosecutor then asked:

Q: . . . [D]id you use those factors in assessing your final conclusion or assessment of sexual abuse?

A: Yes, very definitely, yes.

Q: What was your assessment?

A: My assessment on the basis of the validity of the interview was that I trusted the interview that [E] had been sexually abused by her father.

Q: Was that [based] in part [on] the physical findings and in part upon the interview?

---

[4]Report of Proceedings at 722-25.

[5]Report of Proceedings at 725.

[6]Report of Proceedings at 726.

[7]Report of Proceedings at 726-27.

A: Almost entirely on the interview. The physical findings were compatible, but their absence would not change my impression, so when I look at how I come to my diagnosis, . . . the main [thing] is the history.[8]

After further argument from counsel, the trial court ruled that Dr. Feldman could testify "so as far as rendering an opinion with reasonable medical certainty that [E] is a victim of sexual abuse . . . ."[9] The trial court also ruled that the doctor could testify "about the McGr[a]w-Jones study,"[10] but not "that she believed the child or believed the interview."[11]

When the jury came back into court, the prosecutor did not inquire further about the Jones-McGraw study. Instead, he asked the doctor to list the factors "that you use . . . in reviewing an interview done with a child for the purpose of utilizing it in your diagnoses of whether or not sexual abuse occurred."[12] The doctor responded by listing factors similar to those she had listed in the offer of proof. The prosecutor then asked:

Q: Which factors did you find?

A: I found the specifics of time, place, frequency, presence of reward and element of secrecy, consistency between talking with different people about it, using her own terminology and she was scared, during part of the interview and frequently put her head down on the desk to avoid certain questions.

Q: Now, Doctor, did you then utilize the factors which you have described in Shelly Sobel's interview and physical examination that you yourself conducted and the oral dialogue between you and the child herself and come to an

---

[8]Report of Proceedings at 729.

[9]Report of Proceedings at 731. At about this point in time, the trial court asked, sua sponte, whether the findings of the Jones-McGraw study had "achieved an acceptance in the medical community." Dr. Feldman answered yes. Report of Proceedings at 732.

[10]Report of Proceedings at 732.

[11]Report of Proceedings at 731.

[12]Report of Proceedings at 737.

assessment based upon a medical certainty on the issue of child sexual abuse?

A: Yes.

Q: What was that?

A: I concluded that [E] had been sexually abused.[13]

When defense counsel cross-examined, the doctor reiterated that she was basing her opinion on statements made by E, and not on physical findings.

Q: [by defense counsel]: . . . [T]he physical examination alone would not have resulted in certain diagnosis of any kind of sexual abuse, is that correct?

A: The physical findings alone, correct.

Q: So it was the physical findings combined with the information you received from the child, from Shelley Sobel and from the mother?

A: From the child and Shelley Sobel, pretty much entirely.[14]

Q: . . . [I]n reaching your . . . diagnosis, you had to rely upon what I'll call the history given to you by the mother, child and Shelley Sobel?

A: Yes, less so the mother, mainly we're talking about Shelley and the child.[15]

On appeal, Carlson contends the trial court erred by admitting Dr. Feldman's opinion that E had been sexually abused. According to him, the doctor's physical findings were inconclusive; she lacked any other basis for an opinion; and thus she was merely "testifying about her beliefs as to [the] credibility of the child."[16]

At the outset, we distinguish between an opinion on a

---

[13]Report of Proceedings at 738-39.

[14]Report of Proceedings at 739-40. The information received from Sobel, a social worker, was a description of her interview with E.

[15]Report of Proceedings at 747.

[16]Report of Proceedings at 725.

person's credibility and an opinion on whether the person was sexually abused. The first involves a witness' conduct at the time of trial. The second involves the perpetrator's and victim's conduct at the time of the events being litigated.

The State did not offer Dr. Feldman's opinion to prove E's credibility. Nor could it have done so, for no witness may give an opinion on another witness' credibility.[17] A lay opinion is not "helpful" within the meaning of ER 701, because the jury can assess credibility as well or better than the lay witness. An expert opinion will not "assist the trier of fact" within the meaning of ER 702, because there is no scientific basis for such an opinion, save the polygraph, and the polygraph is not generally accepted as a scientifically reliable technique.[18]

Although the State did not offer Dr. Feldman's opinion to prove E's credibility, it did offer the opinion to prove E had been sexually abused. On appeal, it seems to argue the opinion was admissible as lay opinion, for it says that "Dr. Feldman's opinion was based on inferences from the evidence."[19] At trial, however, it argued the opinion was admissible as expert opinion, and the trial court so ruled.

■ Dr. Feldman's opinion was not admissible as the

---

[17]*State v. Neidigh*, 78 Wn. App. 71, 76, 895 P.2d 423, 427 (1995); *State v. Wright*, 76 Wn. App. 811, 821-22, 888 P.2d 1214, *review denied*, 127 Wn.2d 1010 (1995); *State v. Suarez-Bravo*, 72 Wn. App. 359, 366, 864 P.2d 426 (1994); *State v. Padilla*, 69 Wn. App. 295, 299, 846 P.2d 564 (1993); *State v. Walden*, 69 Wn. App. 183, 186-87, 847 P.2d 956 (1993); *State v. Smith*, 67 Wn. App. 838, 846, 841 P.2d 76 (1992); *State v. Stover*, 67 Wn. App. 228, 231, 834 P.2d 671 (1992), *review denied*, 120 Wn.2d 1025 (1993); *State v. Casteneda-Perez*, 61 Wn. App. 354, 362-63, 810 P.2d 74, *review denied*, 118 Wn.2d 1007 (1991); *State v. Barrow*, 60 Wn. App. 869, 875, 809 P.2d 209, *review denied*, 118 Wn.2d 1007 (1991).

[18]*State v. Rupe*, 101 Wn.2d 664, 690, 683 P.2d 571 (1984); *State v. Grisby*, 97 Wn.2d 493, 502, 647 P.2d 6 (1982), *cert. denied*, 459 U.S. 1211 (1983); *State v. Renfro*, 96 Wn.2d 902, 905-06, 639 P.2d 737, *cert. denied*, 459 U.S. 842 (1982); *State v. Descoteaux*, 94 Wn.2d 31, 38, 614 P.2d 179 (1980), *overruled on other grounds in State v. Danforth*, 97 Wn.2d 255, 257, 643 P.2d 882 (1982); *State v. Sutherland*, 94 Wn.2d 527, 529, 617 P.2d 1010 (1980); *State v. Young*, 89 Wn.2d 613, 621-22, 574 P.2d 1171, *cert. denied*, 439 U.S. 870 (1978); *State v. Woo*, 84 Wn.2d 472, 475, 527 P.2d 271 (1974).

[19]Br. of Resp't at 3.

opinion of a lay witness. ER 701 provides that if a witness is not testifying as an expert, his or her "testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue." ER 701 is the same as FED. R. EVID. 701, and, according to the committee that developed FED. R. EVID. 701, "Limitation (a) is the familiar requirement of first-hand knowledge or observation."[20] Because Dr. Feldman lacked personal knowledge of whether E had been sexually abused, her opinion was not admissible as the opinion of a lay witness.

Similarly, Dr. Feldman's opinion was not admissible as the opinion of an expert witness. The general rule is that a witness qualified as an expert may testify on the basis of "scientific, technical or other specialized knowledge" if his or her testimony "will assist the trier of fact to understand the evidence or to determine a fact in issue . . . ."[21] The question here is whether Dr. Feldman's opinion was based on valid scientific, technical, or other specialized knowledge. At least in criminal cases, Washington adheres to the *Frye* test.[22] That test provides that novel scientific evidence is admissible only if the principle or theory on which it is based has achieved

---

[20]Advisory Committee Note to FED. R. EVID. 701, 56 F.R.D. 183, 281.

[21]ER 702.

[22]*State v. Russell*, 125 Wn.2d 24, 40-41, 882 P.2d 747 (1994), *cert. denied*, 115 S. Ct. 2004 (1995); *State v. Cauthron*, 120 Wn.2d 879, 886, 846 P.2d 502 (1993); *State v. Martin*, 101 Wn.2d 713, 719, 684 P.2d 651 (1984); *cf. Reese v. Stroh*, 74 Wn. App. 550, 556-57, 874 P.2d 200 (announcing different test for civil cases), *review granted*, 124 Wn.2d 1018 (1994). In lieu of the *Frye* test, the federal courts now apply the test announced in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 2796-97, 125 L. Ed. 2d 469, 482 (1993). *Daubert* and *Frye* differ not on what must be decided—under either test the issue is scientific reliability—but rather on who decides. Under *Daubert*, the court decides in light of all factors, one of which is general acceptance in the scientific community. Under *Frye*, scientists decide, and the court recognizes their decision if and when it is generally accepted in their community. Here, we would reach the same result under *Daubert* as we reach under *Frye*.

general acceptance in the relevant scientific community.[23] Whether the test is met is initially a question of preliminary fact decided by the trial court according to ER 104(a) and a preponderance of the evidence.[24] The appellate court reviews de novo (i.e., without deference to the trial court).[25] In conducting its review, the appellate court is "not confined to the record" and may consider "the scientific literature . . . on the ultimate issue of consensus."[26]

*Frye* must be satisfied here. Dr. Feldman's physical findings were inconclusive, and Washington law has never recognized the ability of a doctor or other expert to diagnose sexual abuse based only on the statements of an alleged victim.[27] If Dr. Feldman had a scientific basis for her opinion concerning sexual abuse, that basis surely is novel.

■■ At trial, the State asserted or implied that the Jones-McGraw study provided a scientific theory or principle upon which Dr. Feldman could base an opinion concerning whether E had been sexually abused. On appeal, the State does not reiterate that contention; indeed, it does not even mention the Jones-McGraw study in its brief. The record does not contain a copy of the study, or any information tending to show that the study was verified or replicated after its publication. In short, the record fails to show that the study resulted in any

---

[23]*Cauthron*, 120 Wn.2d at 886 (quoting *Martin*, 101 Wn.2d at 719).

[24]*Daubert*, 113 S. Ct. at 2796-97; *Bourjaily v. United States*, 483 U.S. 171, 175-76, 107 S. Ct. 2775, 97 L. Ed. 2d 144 (1987).

[25]*Cauthron*, 120 Wn.2d at 887.

[26]*Cauthron*, 120 Wn.2d at 887-88 (quoting *People v. Reilly*, 196 Cal. App. 3d 1127, 242 Cal. Rptr. 496, 500 (1987).

[27]*See State v. Florczak*, 76 Wn. App. 55, 73-74, 882 P.2d 199 (1994), *review denied*, 126 Wn.2d 1010 (1995); *State v. Alexander*, 64 Wn. App. 147, 154, 822 P.2d 1250 (1992); *State v. Fitzgerald*, 39 Wn. App. 652, 656-57, 694 P.2d 1117 (1985).

scientific theory or principle,[28] and Dr. Feldman's opinion was not admissible as the opinion of an expert witness.[29]

This conclusion is supported by various cases. In *State*

---

[28]We do not overlook that Dr. Feldman answered "Yes" when the trial court asked her, sua sponte, whether the findings of the Jones-McGraw study had "achieved an acceptance in the medical community." Report of Proceedings at 732. This statement was not an assertion of *general* acceptance in the scientific community, and, even if it were, it asserts general acceptance of the study for what the study was—a preliminary effort not intended for use in the courtroom. *See infra* note 29.

[29]We would reach the same conclusion even if, as permitted but not required, *Cauthron*, 120 Wn.2d at 887-88 (quoting *Reilly*, 242 Cal. Rptr. at 500), we were to consider the Jones-McGraw study as a piece of available scientific literature. Entitled *Reliable and Fictitious Accounts of Sexual Abuse to Children*, 2 J. Interpersonal Violence 27 (1987), the study had two phases. In Phase I, the researchers looked at 576 reports of child abuse made during 1983. They determined that 309 were "founded" and that 267 were "unfounded." They subdivided the 267 into 137 that involved insufficient information, 96 that involved unsubstantiated suspicion, and 34 that were "fictitious." They further subdivided the 34 into 26 generated by adults and eight generated by children. David P. H. Jones & Melbourne J. McGraw, *Reliable and Fictitious Accounts of Sexual Abuse to Children*, 2 J. Interpersonal Violence 27, 29-30 (1987). In judging each report, they used a list of factors somewhat similar to those mentioned by Dr. Feldman during her testimony. Those factors, however, were the premises with which the researchers *began* the study; they were not results reached after applying a scientific theory or principle, or results that the study verified.

In Phase II, the researchers looked at 21 false (fictitious) cases seen at a child abuse center between 1983 and 1985. During that time period, they also saw 696 reliable cases. In five of the 21 cases, the false allegation came from a child. In nine, the false allegation came from an adult. In seven, it was not clear whether the false allegation originated with a child or an adult. *Id.* at 36-37.

After completing both phases, the researchers stated:

> The two phases of this study suggest that fictitious allegations are unusual and that the majority of the suspicions of sexual abuse brought to professional attention prove to be reliable cases. We suggest caution with the interpretation and use of these results, as the DSS [Department of Social Services] survey was a pilot and the clinical survey was uncontrolled. The definition of fictitious used in this study was that professionals did not consider that abuse had occurred. This is subject to error, although in both phases of our study the conclusion of fictitious always followed a consensus of professional opinion. *We therefore suggest that the results be used as a base for further study and not as a definitive basis for proving that a case is or is not "true." (We are aware that our study has already been misused in court for this latter purpose.)*

*Id.* at 38 (emphasis added). They then concluded in part:

> Lastly, the absence of an absolute test of truthfulness implies that clinical conclusions should be offered with caution and due regard as to the degree of certainty that can be applied. In our present state of knowledge, in uncorroborated cases, it would be improper to offer conclusions without reference to what degree of doubt exists.

*v. Fitzgerald*,[30] the defendant was tried for two counts of statutory rape. The two victims testified that the defendant had perpetrated the rapes. The defendant denied this but was nonetheless convicted. Reversing, the appellate court held:

> During the State's case in chief, Dr. Griffith, a pediatrician, testified that based on her interviews with the children she believed that they had been molested. Fitzgerald contends that Dr. Griffith's opinion was improperly admitted because the results of the physical examinations of the victims were inconclusive. He also argues that the effect of her opinion testimony is to tell the jury that she believes the children were truthful, invading the jury's responsibility to make credibility determinations.
>
> . . . .
>
> . . . It is improper for an expert to base an opinion about an ultimate issue of fact solely on the expert's determination of a witness's veracity. The physical evidence does not show whether sexual abuse . . . occurred. Dr. Griffith's opinion is based solely on her evaluation of the children's version of the events. . . . The trial court erred in permitting Dr. Griffith to state her opinion that the children had been molested.[31]

In *State v. Alexander*,[32] the defendant was charged with two counts of rape committed on nine-year-old M. The prosecutor apparently asked M's counselor "whether M gave any indication that she was lying about the abuse."[33] The counselor answered no, and the defendant was convicted. Reversing, the appellate court stated:

> [The defendant] assigns error to the prosecutor's

---

*Id.* at 43. Obviously, then, the Jones-McGraw study does not provide a scientific basis that would allow a doctor or other professional to render an opinion concerning whether a particular child has been sexually abused, based only on the statements of the child.

[30] 39 Wn. App. 652, 694 P.2d 1117 (1985).

[31] *Fitzgerald*, 39 Wn. App. at 656-57.

[32] 64 Wn. App. 147, 822 P.2d 1250 (1992).

[33] *Alexander*, 64 Wn. App. at 154.

questioning [the counselor] about whether M gave any indication that she was lying about the abuse. As in most sexual abuse cases, credibility was a crucial issue here because the testimony of M and Alexander directly conflicted. *See State v. Fitzgerald*, 39 Wn. App. 652, 657, 694 P.2d 1117 (1985). An expert may not offer an opinion on an ultimate issue of fact when it is based solely on the expert's perception of the witness' truthfulness. 39 Wn. App. at 657.[34]

In *State v. Florczak*,[35] Florczak and Terrell were charged with two counts of first degree rape of KT, a three-year-old child. KT's counselor, a person named Wilson, gave an opinion, based only on KT's statements, that KT had been sexually abused. The appellate court ruled:

[C]onstitutional error did occur when, after being asked whether a diagnosis of posttraumatic stress syndrome is "consistent with a child who has suffered sexual abuse," Wilson stated, "[w]hen we give the child posttraumatic stress, it can be to any traumatic event. It is secondary, in this case, in [KT]'s case, to sexual abuse." By stating that her diagnosis of posttraumatic stress syndrome was secondary to sexual abuse, Wilson rendered an opinion of ultimate fact—*i.e.*, whether KT had been sexually abused—which was for the jury alone to decide.[36]

The court ultimately found the error harmless, because the untainted evidence was overwhelming.

In *State v. Black*,[37] the defendant was charged with the second degree rape of R.J. A counselor testified that "[t]here is a specific profile for rape victims and [R.J.] fits in."[38] The Supreme Court reversed, in part because the testimony objected to "carries with it an implied opinion

---

[34]*Alexander*, 64 Wn. App. at 154.

[35]76 Wn. App. 55, 882 P.2d 199 (1994), *review denied*, 126 Wn.2d 1010 (1995).

[36]*Florczak*, 76 Wn. App. at 74.

[37]109 Wn.2d 336, 348, 745 P.2d 12 (1987).

[38]*Black*, 109 Wn.2d at 339.

that the alleged victim is telling the truth and was, in fact, raped."[39]

In *State v. Madison*,[40] the defendant was charged with first degree statutory rape. He claimed on appeal that a Child Protective Services caseworker had given testimony amounting "to a statement of belief in the victim's story. . . ."[41] The appellate court was "satisfied that some of the statements . . . would properly have been subject to an objection or motion to strike."[42] It declined to grant relief, however, because no objection or motion to strike had been made at the trial.[43]

■ Based on the rules of evidence and these cases, it was error to admit Dr. Feldman's opinion.[44] Moreover, the error was not harmless. The case boiled down to E's word against Carlson's word. There was no physical evidence and no independent witness to the charged events. The first trial ended in a hung jury. It is within reasonable probabilities that the opinion affected the outcome of the trial,[45] and a new trial is required.

Reversed and remanded for further proceedings.

A majority of the panel having determined that only the foregoing portion of this opinion will be printed in the Washington Appellate Reports and that the remainder shall be filed for public record pursuant to RCW 2.06.040, it is so ordered.

---

[39]*Black*, 109 Wn.2d at 349.

[40]53 Wn. App. 754, 770 P.2d 662, *review denied*, 113 Wn.2d 1002 (1989).

[41]*Madison*, 53 Wn. App. at 760.

[42]*Madison*, 53 Wn. App. at 762.

[43]*Madison*, 53 Wn. App. at 762.

[44]This does not mean that a doctor cannot base an opinion on physical findings, ER 702; that a doctor cannot relate a child's statements made for purposes of medical diagnosis or treatment, ER 803(a)(4), *In re Penelope B.*, 104 Wn.2d 643, 655-57, 709 P.2d 1185 (1985); or that a doctor cannot describe a child's nonassertive demeanor, *Penelope B.*, 104 Wn.2d at 651-55. None of these matters is in issue here.

[45]*See State v. Jackson*, 102 Wn.2d 689, 695, 689 P.2d 76 (1984).

Seinfeld, C.J., and Houghton, J., concur.