# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
## DIVISION ONE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 74527-1-I |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| JOEY L. MCFARLAND, | ) | UNPUBLISHED OPINION |
| | ) | |
| Appellant. | ) | FILED: April 24, 2017 |
| | ) | |

VERELLEN, C.J. — Joey McFarland appeals his conviction for residential burglary committed while the victim was present. He argues he was denied his constitutional right to a fair trial by a jury when a police officer expressed his opinion on guilt and witness credibility. But the overwhelming, untainted evidence of McFarland's guilt is sufficient to convince this court beyond a reasonable doubt that the improper testimony did not affect the jury verdict. Therefore, we hold that the error was harmless. McFarland's other issues are not compelling. We affirm.

## FACTS

Just before 7:00 a.m. on October 22, 2014, Kyli Clark woke to her dogs barking. She went downstairs and found the sliding glass door leading to her fenced in backyard unlocked. She saw a t-shirt from her laundry inside the house was now on the back porch and was dry even though it was raining outside. Kyli kept her purses on a small table near the sliding door and noticed one was missing. The purse contained her

house and car keys, wallet, phone, and other valuables. Kyli then noticed "very distinct muddy shoe prints" leading from the sliding door to the small table where she kept her purses and dry laundry from the night before. She called the police.

Officer Ray Riches arrived within two to three minutes of Kyli's call, and Officer Derek Carlile arrived shortly thereafter. Officer Riches examined the shoeprints inside the house and noticed that they were still wet. He walked around the house with Kyli and discovered the backyard gate was open. Kyli explained they use a heavy curtain rod to prop up the fence and that the rod must be moved in order to open the gate. Kyli further explained the rod was positioned towards the top of the fence so her children could not reach it. Because the burglary appeared to have happened very recently, Officer Riches sent Officer Carlile to canvass the neighborhood.

Officer Carlile drove north in his patrol car. Four to five houses away, Officer Carlile noticed a long driveway that led to an apartment shared by Leanna Fuller and her boyfriend Joey McFarland. Fuller and McFarland were outside. Officer Carlile noticed Fuller was petite and barely five-feet tall. McFarland was taller than Officer Carlile, who was five-feet ten inches. Fuller and McFarland both bent down when they saw Officer Carlile and quickly went inside the apartment. Officer Carlile thought this was suspicious, so he walked down the driveway to speak with them.

Officer Carlile told McFarland and Fuller he was investigating a burglary and asked them to come outside. McFarland came outside and told Officer Carlile he had seen two people walking by about 30 minutes earlier. Officer Carlile noticed McFarland was wearing Nike high top shoes and asked to see the bottom of them. The tread pattern matched Officer Carlile's recollection of the pattern of the muddy shoeprints on

2

the Clarks' floor, so he radioed to Officer Riches. About this time, Fuller came outside. When Officer Riches arrived, he confirmed the shoe tread matched the muddy prints and took the shoes into evidence. McFarland said the shoes, size 10 men's, were not his.

McFarland told the officers he had been near the Clarks' house earlier that morning looking for Fuller's dog, but that he had been wearing slippers. Fuller retrieved the slippers from the apartment and McFarland confirmed they were the ones he had been wearing earlier. Officer Carlile noticed the slippers were dry, even though it had been raining that morning.

The officers returned to the Clarks' home to compare the shoeprints with the seized shoes. The shoes matched the prints in size and tread. The officers then went back outside to arrest McFarland. Outside, they found Fuller standing in the Clarks' driveway on the phone. Kyli's purse was sitting on the trunk of Officer Carlile's patrol car. Some of Kyli's property was still inside the purse, but her house and car keys were not. Fuller told the officers McFarland had found the purse while walking around earlier, and that he wanted her to return it because he had already left for work. Officer Carlile, however, saw McFarland hiding nearby in some bushes and noticed him run back inside the apartment.

The officers followed McFarland back to the apartment. They asked Sergeant Adam Vermeulen, who was en route, to call McFarland and ask him to come outside. McFarland told Sergeant Vermeulen over the phone that he found the purse on a sidewalk. During the standoff, Fuller was very agitated and ran back inside the

apartment contrary to the officers' orders. When McFarland came outside several minutes later, he was arrested.

By the time McFarland was questioned at the police station, he had told several versions of events. Officer Carlile asked him why he lied earlier and McFarland explained he did not want the police to think he had stolen the purse. McFarland said he might have gone through the Clarks' gate and into their backyard while looking for Fuller's dog. He said he went through Kyli's purse but found no keys inside.

Police searched the apartment shared by McFarland and Fuller pursuant to a warrant. They found Kyli's car key in another one of her purses hidden underneath some insulation in the attack. An adult tricycle was also missing from the Clarks' yard and was found in the front yard of the apartment.

The State charged McFarland by amended information with one count of residential burglary committed while the victim was present.

In August 2015, 10 months after the burglary, Fuller told defense counsel it was she, not McFarland, who had committed the burglary.

The case was tried in October 2015. Fuller testified for the defense. She explained she had not slept for days before the burglary because she was on drugs and that she had difficulty remembering what had happened. Despite her lack of memory, Fuller testified that on the morning of October 22, she slipped on McFarland's Nike high tops and stepped outside to smoke a cigarette and let her dog out. Her dog ran away so she got on a bike to follow. She did not remember what bike.

Fuller said she rode toward the Clarks' house and went into their backyard. She did not remember a fence or a gate or whether it was open or closed. In the backyard,

4

Fuller noticed purses through the sliding glass door. She did not remember if it was a slider door, whether it was open or closed, or whether it was locked. Fuller went inside, took some purses, and left on a bike. She did not remember what bike.

Fuller testified she went home, took off McFarland's shoes, and changed her clothes. She woke up McFarland and "told him some[thing] along the lines of what happened."[1] McFarland told Fuller to return the purses because he had been through similar situations and "didn't want any part of it."[2]

Fuller said that when the police first arrived, she was outside again but could not remember why. She and McFarland both talked to the police but she could not remember what they said. Fuller said nothing when the police asked for McFarland's shoes because she was scared.

When the police left, McFarland told Fuller to take the purses back, so she "walked them down to the house, and set them on the . . . police car."[3] Fuller said she lied when she told the police McFarland had left for work. She said that when she initially got the purses, she "hid some of the contents . . . inside my place," and when she returned the purses, she "was just in a hurry" to get them back "so I gathered what I could find, and then took it back."[4]

Fuller testified she finally came forward in August 2015 because "I got sober, and really thought out my priorities."[5] She acknowledged she had previously claimed that

---

[1] Report of Proceedings (RP) (Oct. 21, 2015) at 356.

[2] Id. at 357.

[3] Id. at 364.

[4] Id. at 366.

[5] Id. at 368.

McFarland's defense attorney had read her the police reports, but she could no longer remember if that was true. She also acknowledged her version of events changed from one interview to the next. Fuller believed that if she were convicted of the burglary she would be facing less time than McFarland because "I know my record's not that bad."[6]

The jury found McFarland guilty of residential burglary and returned a special verdict form finding the victim was present in the dwelling during the burglary. The trial court sentenced McFarland to 84 months confinement.

McFarland appeals.

## ANALYSIS

### IMPROPER OPINION TESTIMONY

For the first time on appeal, McFarland contends that Officer Carlile testified to an improper opinion on guilt and witness credibility.

During direct examination, Officer Carlile testified,

> [Fuller] looked at me . . . in fear . . . as if I knew some deep, dark secret or something that she didn't want me to know, like she had been caught, like they had been caught red-handed, as if I kn[ew] that [McFarland] had done the burglary. And she was very scared for him.[7]

McFarland did not object. On cross-examination, defense counsel immediately began eliciting statements to reflect the theory that the investigating officers prematurely concluded McFarland was the guilty party and that their resulting investigation was incomplete and inconsistent:

---

[6] Id. at 388.

[7] RP (Oct. 20, 2015) at 210.

6

Defense: I'm going to start by asking you a little bit about your state of mind, your state of mind as an investigator, just to kind of get an idea what your perspective was, and what you were thinking, as you did your work.

Carlile: Okay.

Defense: It's fair to say that by the time [Fuller] brought you that purse, you already had a pretty firm belief that they were involved in this burglary?

Carlile: That [McFarland] had done it, yes.

Defense: And in fact, yeah, you were pretty confident that [McFarland] had done it, and you didn't need that purse to be delivered to you, to form that opinion; right?

Carlile: Not necessarily.

Defense: By the time, really, that you matched the shoes, you had a pretty firm idea in your head that he's the guy who went inside the house?

Carlile: That's correct.[8]

Defense counsel followed up with questions that emphasized what he believed were mistakes, flaws, and omissions in the investigation, suggesting they were a result of the officer's rush to judgment:

Defense: [B]y the time Mr. McFarland was making any statements to you, you had already formed the opinion that he was guilty of this burglary?

Carlile: True.

Defense: So when the jury hears you relaying his statements, it's fair to say that's also coming through the filter of your own expectation that he is guilty, whatever he says?

Carlile: I'm taking what was told to me, and portraying it the best that I possibly can.

. . . .

---

[8] RP (Oct. 21, 2015) at 240.

7

Defense: Now, it's fair to say that when he talks about—you know, when you record statements of him saying that maybe he was in the side yard, looking for his dog, you felt like that was excuse-making; correct?

Carlile: Absolutely.

. . . .

Defense: So he's taking the blame, correct[?]

Carlile: He is.

. . . .

Defense: And what's on his mind is his girlfriend's well-being, and what's going to happen to her?

Carlile: I don't necessarily believe that. I believe he's more so minimizing that he went inside the house and stole the purse in a burglary, rather than finding it on the side of the road. That's my personal belief.[9]

Defense counsel challenged Officer Carlile's interpretation of Fuller's reaction to his suggestion that McFarland committed the burglary. Defense counsel also focused on the lack of investigation into Fuller. On redirect, the State followed up with questions about what evidence led Officer Carlile to form his opinions. Officer Carlile offered his opinion on Fuller's confession.

Although several statements by Officer Carlile were invited by defense counsel's questions regarding the theory that the officers prematurely concluded McFarland was the guilty party, the State properly concedes the officer went beyond the scope of the defense questions and improperly emphasized his personal beliefs. The State also properly concedes that its questions resulted in several examples of improper opinion testimony on the credibility of McFarland and Fuller.

---

[9] RP (Oct. 21, 2015) at 246-48.

Improper opinion testimony violates the defendant's constitutional right to a jury trial by invading the fact-finding province of the jury.[10] A witness is not allowed to give an opinion on another witness's credibility.[11] Opinions on guilt are generally improper whether made directly or by inference.[12] Because improper opinion testimony violates a constitutional right, a defendant may generally raise the issue for the first time on appeal.[13] Under RAP 2.5(a)(3), we may consider a manifest error affecting a constitutional right raised for the first time on appeal.

"Where a defendant contends a manifest error occurred at the trial level, we review the error employing a four-part test."[14]

> First, we determine whether the alleged error is a constitutional error. Second, we determine whether the alleged error is manifest. Key to this determination is "a plausible showing by the defendant that the asserted error had practical and identifiable consequences in the trial of the case." Third, if we find the alleged error to be manifest, then we must address the merits of the constitutional issue. Finally, if we determine that a constitutional error occurred, then we undertake a harmless error analysis.[15]

Because improper opinion testimony invades the province of the jury and thus violates a constitutional right of the defendant, we need not address the first three points in the test.[16] Instead, we now must determine whether the admission of the improper opinion testimony was harmless error. A constitutional error is harmless "if the

---

[10] State v. Dolan, 118 Wn. App. 323, 329, 73 P.3d 1011 (2003).

[11] State v. Carlson, 80 Wn. App. 116, 123, 906 P.2d 999 (1995).

[12] State v. Quaale, 182 Wn.2d 191, 199, 340 P.3d 213 (2014).

[13] State v. Saunders, 120 Wn. App. 800, 811, 86 P.3d 232 (2004).

[14] State v. Thach, 126 Wn. App. 297, 312-13, 106 P.3d 782 (2005) (citing State v. Lynn, 67 Wn. App. 339, 345, 835 P.2d 251 (1992)).

[15] Id. (internal citations omitted) (quoting Lynn, 67 Wn. App. at 345).

[16] Id. at 312; Dolan, 118 Wn. App. at 329.

appellate court is convinced beyond a reasonable doubt that any reasonable jury would have reached the same result in the absence of the error."[17]  In Washington, we determine whether the error was harmless by applying the "overwhelming untainted evidence" test, meaning "the appellate court looks only at the untainted evidence to determine if it is so overwhelming that it necessarily leads to a finding of guilt."[18]

Here, there is no dispute that the burglary took place and was committed by McFarland or Fuller or both.[19]  The evidence of McFarland's guilt is overwhelming. First, the physical evidence is entirely consistent with McFarland's guilt and inconsistent with Fuller's testimony.  Within minutes after the robbery, McFarland was found a few houses away wearing size 10 Nike high tops with the tread matching the wet muddy shoeprints inside the Clarks' house.  The slippers McFarland claimed to have been wearing while looking for Fuller's dog that rainy morning were dry.

Although the petite Fuller hypothetically could have been wearing those exact same size 10 Nike high tops when she rode a bike to look for her dog that ran away, the timeline is entirely inconsistent with such a scenario.  Kyli's husband Joshua testified that he left for work the morning of the burglary at 5:45 a.m.  Joshua testified that the sliding back door was closed and locked when he left.  Kyli awoke to her dogs barking just before 7:00 a.m.  She immediately noticed wet muddy shoeprints on the floor, her missing purse, and the open sliding glass door and called the police.

Officer Riches arrived within two to three minutes of Kyli's call.  When he saw that the muddy shoeprints were still wet, he told Officer Carlile, who arrived minutes

---

[17] State v. Guloy, 104 Wn.2d 412, 425, 705 P.2d 1182 (1985).

[18] State v. Ramirez, 49 Wn. App. 332, 339, 742 P.2d 726 (1987) (citing id. at 426).

[19] The court gave an accomplice liability instruction.

later, to drive through the neighborhood to look for suspects. Officer Carlile drove past four to five houses before finding McFarland and Fuller outside in a driveway. Fuller and McFarland both bent down when they saw Officer Carlile and quickly went inside their apartment. Officer Carlile approached the apartment and asked McFarland and Fuller to come outside. When McFarland came outside, Officer Carlile immediately noticed he was wearing Nike high tops that matched the tread of the shoeprints inside the Clarks' house. There is no viable switching of the Nike high tops from Fuller to McFarland in that limited timeline.

Moreover, the physical evidence of the height and strength required to remove the heavy curtain rod to open the Clarks' back gate excludes Fuller as the perpetrator. And Fuller's testimony did not merely have gaps; she gave multiple inconsistent versions of events, none of which fit the physical evidence. No coherent scenario reconciles the physical evidence with Fuller's version of events. The overwhelming, untainted evidence of McFarland's guilt is sufficient to convince this court beyond a reasonable doubt that the improper testimony did not affect the jury verdict. Therefore, we hold that the error was harmless.[20]

---

[20] McFarland also asserts that he received ineffective assistance of counsel because his defense counsel failed to object to the opinion testimony. For the same reasons supporting harmless error, he fails to establish any prejudice. State v. Nichols, 161 Wn.2d 1, 8, 162 P.3d 1122 (2007) (prejudice, as an element of ineffective assistance, is established if the defendant shows there is a reasonable probability that, but for counsel's unprofessional errors, the outcome of the proceeding would have been different.).

11

## COURT COSTS

McFarland contends that the sentencing court erred by imposing $200 in "court costs." McFarland claims this fee is discretionary, and therefore should have been waived by the sentencing court. McFarland is incorrect.

A pertinent statute requires that courts impose a filing fee on certain criminal defendants. "Upon conviction or plea of guilty, . . . an adult defendant in a criminal case shall be liable for a fee of two hundred dollars."[21] Sentencing courts do not have the discretion to decline to impose mandatory legal financial obligations.[22]

At sentencing, the court repeatedly stated that it was imposing "a $500 victim penalty assessment, a $100 biological sample fee, [and] a $200 filing fee."[23] While the judgment and sentence lists $200 in "court costs," it is clear from the record that the $200 in court costs is, in fact, the mandatory filing fee. McFarland has not explained how the $200 in court costs could be anything else in light of the filing fee being otherwise not ordered. Accordingly, there was no error.[24]

## APPELLATE COSTS

McFarland asks the court to deny the State appellate costs. Newly amended RAP 14.2 requires us to follow a trial court finding of indigency unless the State provides sufficient new evidence to overcome that finding:

---

[21] RCW 36.18.020(2)(h).

[22] State v. Clark, 191 Wn. App. 369, 373, 362 P.3d 309 (2015).

[23] RP (Dec. 28, 2015) at 20; RP (Dec. 16, 2015) at 456.

[24] McFarland also asserts that he received ineffective assistance of counsel because his defense counsel failed to object to the imposition of the $200 filing fee. For the reasons discussed herein, his assertion fails.

When the trial court has entered an order that an offender is indigent for purposes of appeal, that finding of indigency remains in effect, pursuant to RAP 15.2(f), unless the commissioner or clerk determines by a preponderance of the evidence that the offender's financial circumstances have significantly improved since the last determination of indigency.

Here, after the trial court entered the judgment and sentence, the trial court signed an order authorizing McFarland to seek appellate review at public expense and appointment of an attorney. RAP 14.2 places the burden on the State to show McFarland's position has changed. The State has not done so. If the State has evidence indicating that McFarland's financial circumstances have significantly improved since the trial court's finding, it may file a motion for costs with the commissioner.

Affirmed.

WE CONCUR: