IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 76422-5-I |
| | ) | |
| Respondent, | ) | DIVISION ONE |
| | ) | |
| v. | ) | |
| | ) | |
| HECTOR HUGO TALAVERA, | ) | UNPUBLISHED OPINION |
| | ) | |
| Appellant. | ) | FILED: November 13, 2018 |

SMITH, J. — Hector Talavera appeals the judgment and sentence imposed pursuant to his jury conviction for first degree rape of a child and first degree child molestation. Talavera contends (1) defense counsel was constitutionally ineffective for failing to impeach witnesses with their testimony from an earlier trial, (2) two of the State's witnesses improperly vouched for the credibility of other witnesses, (3) the trial court erred in admitting hearsay evidence, (4) he was denied his right to a unanimous verdict, and (5) cumulative error denied him a fair trial. We affirm.

## FACTS

M.H.S. is Talavera's younger cousin. Talavera lived with M.H.S.'s family for approximately 10 years, until M.H.S. was 9 or 10 years old. M.H.S. considered Talavera, who was in his twenties at the time, to be "like a big brother." Report of Proceedings (RP) (Dec. 13, 2016) at 374.

M.H.S.'s father frequently sent Talavera to buy pan dulce, a type of sweet bread, from a bakery. Talavera occasionally took M.H.S. with him to the bakery but refused to allow M.H.S.'s siblings to accompany them. On the way to the bakery, Talavera would put his hand in between M.H.S.'s legs and rub her vaginal area over her clothing. M.H.S. testified that this happened on approximately 10 different occasions and that she was around 9 or 10 years old at the time.

On another occasion, M.H.S. and her younger sister Kimberly had a "sleepover" in Talavera's bed. RP (Dec. 13, 2016) at 383. During the middle of the night, Talavera moved Kimberly over and then pulled down his pants and put M.H.S.'s hand on his penis. Each time M.H.S. tried to move her hand away, Talavera put it back on his penis. Talavera stopped after M.H.S. tried to wake up Kimberly.

M.H.S. testified about another incident with Talavera that happened when she was 9 years old. M.H.S. was wearing a zippered one piece pajama set. Talavera told her to change clothes, so M.H.S. went upstairs to her bedroom and got dressed. However, M.H.S. did not return downstairs "[b]ecause I didn't want him to touch me." RP (Dec. 13, 2016) at 386. Talavera went upstairs, picked up M.H.S. and put her over his shoulder, and carried her to his bedroom. Talavera pulled down M.H.S.'s pants and his own pants and put his penis into M.H.S.'s vagina. M.H.S. pretended that she heard her mother calling for her, and Talavera stopped. M.H.S. testified that it hurt and that she saw blood when she went to the bathroom.

After Talavera moved out of M.H.S.'s house, he continued to visit frequently. M.H.S. testified about two other incidents that occurred in the family's living room. The first time, M.H.S. was sitting on the couch when Talavera sat next to her, spread a blanket over them, and touched her vaginal area over her clothing. M.H.S. moved to a different couch and ultimately to her own room in order to escape Talavera. The second time, M.H.S. was lying on the floor underneath a blanket watching television with other members of her family in the room. Talavera lay down next to M.H.S., underneath the blanket, and touched her vaginal area over her clothing. M.H.S. testified that she was around 9 or 10 years old at the time of these two incidents.

M.H.S. did not tell her parents what happened because "[t]hey loved him a lot" and she "felt embarrassed." RP (Dec. 13, 2016) at 389. However, several years later, M.H.S. received a text message from a friend who told her that he was in counseling for depression and "how it sucks to have had something that you know that no one can know." RP (Dec. 13, 2016) at 395-96. This prompted M.H.S. to tell her mother what had happened with Talavera.

The following day, M.H.S.'s eyes were puffy from crying and she attempted to hide them with "bruise makeup" and dark sunglasses. RP (Dec. 13, 2016) at 398-99. M.H.S.'s biology teacher "could tell that something was wrong." RP (Dec. 14, 2016) at 502. She took M.H.S. aside and asked if someone had hit her. M.H.S initially stated that her boyfriend hit her but ultimately disclosed the sexual abuse by Talavera. M.H.S. participated in a sexual assault evaluation by

No. 76422-5-I/4

forensic nurse Colette Dahl and an interview with child interview specialist Gina Coslett.

The State charged Talavera by amended information with one count of first degree rape of a child and four counts of first degree child molestation, alleged to have occurred between January 24, 2007, and January 23, 2010, when M.H.S. was between the ages of 9 and 12. Talavera's first trial took place from September 20 to September 22, 2016. The jury was unable to agree on a verdict as to any of the counts, and the trial court declared a mistrial. Talavera's second trial took place from December 12 to December 15, 2016. A jury convicted Talavera as charged. Talavera appeals.

DECISION

1.    Ineffective Assistance of Counsel

Talavera argues that defense counsel was ineffective for failing to obtain a complete transcript from his prior trial. He contends that without a transcript, he was unable to impeach M.H.S. or her sister with inconsistencies in their testimony.

We review claims of ineffective assistance of counsel de novo. State v. Estes, 188 Wn.2d 450, 457, 395 P.3d 1045 (2017). In order to establish ineffective assistance of counsel, a defendant must demonstrate both that counsel's conduct was deficient and that the deficient performance resulted in prejudice. State v. Nichols, 161 Wn.2d 1, 8, 162 P.3d 1122 (2007). To show that counsel's performance was deficient, the defendant must establish that it fell below an objective standard of reasonableness given the circumstances. State v.

-4-

McFarland, 127 Wn.2d 322, 334-35, 899 P.2d 1251 (1995). If counsel's conduct can be characterized as a legitimate trial strategy or tactic, performance is not deficient. State v. Grier, 171 Wn.2d 17, 33, 246 P.3d 1260 (2011). To show that the deficient performance was prejudicial, the defendant must show that there is a reasonable probability that but for counsel's errors the result of the proceeding would have been different. McFarland, 127 Wn.2d at 334-35. "Failure to make the required showing of either deficient performance or sufficient prejudice defeats the ineffectiveness claim." Strickland v. Washington, 466 U.S. 668, 700, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). We engage in a strong presumption that counsel's representation was effective. McFarland, 127 Wn.2d at 335.

a.     M.H.S.'s testimony regarding trips to the bakery

During the first trial, the prosecutor asked M.H.S. how many times Talavera molested her in the car to the bakery.

[PROSECUTOR:] How many times did this happen in the car when you were going on these trips?

. . . .

[PROSECUTOR:] Was it more than one?

[M.H.S.:] Yeah.

[PROSECUTOR:] Was it more or less than ten?

. . . .

[M.H.S.:] More than ten.

[PROSECUTOR:] More or less than 20?

[M.H.S.:] I would say 20.

RP (Dec. 21, 2016) at 77. During the second trial, M.H.S. testified as follows.

> [PROSECUTOR:] And did this happen more than once?
>
> [M.H.S.:] Yes.
>
> [PROSECUTOR:] Do you know how many times?
>
> [M.H.S.:] I don't know exactly how many times, but it did happen.
>
> [PROSECUTOR:] Did it happen more than five times?
>
> [M.H.S.:] Yeah.
>
> [PROSECUTOR:] Ten, more than ten?
>
> [M.H.S.:] I would say around there.

RP (Dec. 13, 2016) at 378.

### b.   Kimberly's testimony regarding the "sleepover"

During the first trial, the prosecutor asked M.H.S.'s sister, Kimberly, about her recollection of the "sleepover" in Talavera's bed.

> [PROSECUTOR:] Did you ever spend the night down in Hugo's[1] room?
>
> [KIMBERLY:] There is not really—there is—not that I remember. Like, there is not a night I remember, but maybe, because I was so young, probably could have been a time. Like, right now I don't remember a time sleeping there.
>
> [PROSECUTOR:] Okay. Would it have seemed strange to you?
>
> [KIMBERLY:] Not really. I honestly would have seen it perfectly fine. I saw him as family that was like an older brother, so I—mostly see it as a sleepover.

RP (Sept. 21, 2016) at 163-64.

---

[1] Several witnesses testified that Talavera went by his middle name.

In Talavera's second trial, the prosecutor did not ask Kimberly any questions about the sleepover, but defense counsel raised the issue during cross-examination.

> [DEFENSE COUNSEL:] Was there ever a time that you remember having a sleepover with [M.H.S.], you and Hugo and you slept on his bed?
>
> [KIMBERLY:] Yeah, I don't know if it was—I don't know if it was the ground floor or the bed. I don't remember.
>
> [DEFENSE COUNSEL:] You remember that?
>
> [KIMBERLY:] But I do remember the sleepover.
>
> [DEFENSE COUNSEL:] Okay. Do you remember I asked that you in a different hearing and you said no?
>
> [KIMBERLY:] What do you mean?
>
> [DEFENSE COUNSEL:] I asked you the exact same question in a different hearing and you said that you could not remember a night that you had a sleepover with Hugo.
>
> [KIMBERLY:] Well, we did.
>
> [DEFENSE COUNSEL:] So was that true or was what you are saying today true?
>
> [KIMBERLY:] What I am saying today is true.
>
> [DEFENSE COUNSEL:] On that occasion you said it under oath.

RP (Dec. 14, 2016) at 490.

The prosecutor objected. Outside the presence of the jury, the prosecutor stated:

> Your Honor, there is no transcript of the prior testimony from the prior hearing. [Defense counsel] is, in essence, making herself a witness. What she is saying is not my recollection. My recollection

is that this witness said that she didn't remember, and then on redirect she said that it wouldn't have been unusual if that happened. Nevertheless, I don't think this is proper impeachment when it is just purely based on defense counsel who is not a witness and not on a witness' memory.

RP (Dec. 14, 2016) at 491. Defense counsel responded:

I could do a transcript, Your Honor, but it's just going to take longer. My notes say I cannot remember a night I slept in Hugo's room, quotation sleepover, and I do have that she said that that would not be unusual as well. . . .

. . . .

. . . I was going to ask her if she remembers saying that. If you want me to have the transcript made, I can do that, Your Honor. I will recall her in defense case.

RP (Dec. 14, 2016) at 491-92. The trial court stated:

Without a transcript, if the witness' statement is either I didn't say that or I don't remember saying that, or what have you, the questioning needs to stop there in the Court's view, because there is nothing further that you can offer since you don't have a transcript at this time.

. . . .

. . . I don't have any qualms you asking that last question that you want to ask, so the State's objection to that is overruled. But whatever her answer is, it needs to stand, unless there is some further objective evidence as to what her testimony was at that trial.

RP (Dec. 14, 2016) at 492-94.

When the jury returned, defense counsel continued as follows:

[DEFENSE COUNSEL:] Thank you, Kimberly. Do you ever recall telling us before that you don't remember ever having a sleepover in Hugo's bedroom on the bed?

[KIMBERLY:] I guess, but I was probably nervous, because I did get nervous.

[DEFENSE COUNSEL:] Are you nervous now?

[KIMBERLY:] A little.

> [DEFENSE COUNSEL:] Okay. Does you being nervous change your memory?
>
> [KIMBERLY:] I mean, yeah. . . .

RP (Dec. 14, 2016) at 495.

Talavera contends, without citation to authority, that it is per se deficient for an attorney to fail to request transcripts of a prior trial ending in a mistrial. But it is unnecessary to address this claim because Talavera does not establish prejudice. Under the circumstances, the inconsistencies in M.H.S.'s testimony were minimal. It was clear in both trials that M.H.S. was unsure of the actual number of incidents and was estimating broadly. Moreover, M.H.S. remembered *fewer* incidents in the second trial than she did in the first. Despite Talavera's claims to the contrary, it was not unreasonable that defense counsel chose not to highlight the higher number from the first trial.

Nor does Talavera establish prejudice with regard to Kimberly's testimony. During the first trial, Kimberly testified that while she did not specifically remember a sleepover occurring, there "probably could have been a time." RP (Sept. 21, 2016) at 164. Kimberly testified that such an occurrence would not be unusual because Talavera was like an older brother to her. During the second trial, Kimberly testified that she did remember a sleepover occurring. However, such an inconsistency was not significant because Kimberly did not give any details about what happened at the sleepover. Furthermore, defense counsel successfully impeached Kimberly's credibility even without the transcript. In response to defense counsel's questioning, Kimberly admitted that she gave a

different statement at the first trial. She also testified that testifying made her nervous and that being nervous could "change [her] memory." RP (Dec. 14, 2016) at 495. Talavera fails to establish a reasonable probability that the outcome of the trial would have been different had defense counsel obtained a transcript of the first trial.[2]

2.   Vouching

For the first time on appeal, Talavera contends that he was denied his right to a fair trial because two of the State's witnesses—child interview specialist Gina Coslett and Detective Susan Eviston—vouched for the credibility of other witnesses.

"[N]o witness may give an opinion on another witness' credibility." State v. Carlson, 80 Wn. App. 116, 123, 906 P.2d 999 (1995). Such testimony invades the province of the jury as the ultimate arbiter of credibility of the witness. State v. Warren, 134 Wn. App. 44, 52-53, 138 P.3d 1081 (2006), aff'd, 165 Wn.2d 17, 195 P.3d 940 (2008). However, where a defendant did not object below, he or she may only raise an error on appeal if it is manifest constitutional error. State v. Kirkman, 159 Wn.2d 918, 934, 155 P.3d 125 (2007). Improper opinion testimony constitutes a manifest constitutional error only if the witness made "an explicit or almost explicit witness statement on an ultimate issue of fact." Kirkman, 159 Wn.2d at 936.

---

[2] Talavera argues that defense counsel could also have used the transcript to impeach M.H.S. "potentially on her other vague and guessed-at answers." Br. of Appellant at 19. Talavera does not identify any portions of the record relevant to this claim, and we decline to review it.

### a. Gina Coslett's testimony

Coslett explained "the rules" for conducting a child interview, including that the child not guess at answers, that the child ask for clarification of anything he or she does not understand, and that the child "promise [to] tell the truth." RP (Dec. 14, 2016) at 604. Coslett testified that if a child "appears they're not following the rules" that she "might go over the rules again." RP (Dec. 14, 2016) at 605. Coslett stated that she did not "have the need to reiterate the rules" with M.H.S. RP (Dec. 14, 2016) at 607.

When the prosecutor asked about M.H.S.'s demeanor during the interview, Coslett testified that during the initial introductions, M.H.S. "was able to talk about her feelings and you could see that in her demeanor." But when Coslett began asking questions about Talavera, [M.H.S.] "got quiet . . . she was careful to think about her answer and give me the information." RP (Dec. 14, 2016) at 606-07.

The prosecutor asked Coslett to define "a good interview."[3] RP (Dec. 14, 2016) at 608. Coslett testified that "good interviews or an interview is being able to bring in the research with also the developmental knowledge, asking the open-ended questions and waiting for the information to be able to build upon that in getting more detail." RP (Dec. 14, 2016) at 609. She stated that she considered M.H.S.'s interview "a good interview." RP (Dec. 14, 2016) at 609.

---

[3] Talavera objected to this question at trial on relevance grounds, not on the grounds he now raises on appeal.

Here, Coslett's statements about "the rules" of the interview did not constitute a comment on M.H.S.'s credibility. Coslett agreed during cross-examination that she had "no way of knowing" if the child she was interviewing was being truthful and explicitly stated that her role was not to determine the truth of the allegations. RP (Dec. 14, 2016) at 612. The testimony did not infringe on the jury's role as the ultimate judge of M.H.S.'s credibility. Nor were Coslett's comments on M.H.S.'s demeanor during the interview improper. A witness may describe the manner and demeanor of a child at the time the child is making statements and state inferences from these observations. State v. Madison, 53 Wn. App. 754, 760, 770 P.2d 662 (1989). And Coslett explained that a "good interview" meant that the interviewer correctly followed standard protocols; it did not refer to whether the interviewee was telling the truth. Coslett's testimony did not give rise to manifest constitutional error reviewable for the first time on appeal.

b.    Detective Susan Eviston's testimony

Detective Eviston testified about the steps she took in her investigation. When the prosecutor asked why Detective Eviston chose to use a child interview specialist despite the fact that M.H.S. was 17, Detective Eviston responded:

> For me personally you heard Ms. Coslett and her level of expertise is just unquestionable, so I don't want to make mistakes, because a lot of these cases, and especially this case, these disclosure [sic] come later, usually when someone's life is falling apart than we hear what's caused them to be the way they are, and I don't want to make mistakes. And, so I want the professional forensic interviewer to do the interview . . . .

RP (Dec. 14, 2016) at 624-25. Detective Eviston observed the child interview through a one-way mirror. When asked about M.H.S.'s demeanor during the interview, she described M.H.S. "just a really shattered little girl." RP (Dec. 14, 2016) at 627.

However, Detective Eviston gave Coslett's expertise as only one reason for her decision; she also testified that having Coslett conduct the interview gave her more freedom to observe a child's demeanor and determine whether the statutory elements for a crime were met. And Detective Eviston's comments that M.H.S. appeared traumatized were permissible comments on M.H.S.'s demeanor. See, e.g., State v. Magers, 164 Wn.2d 174, 190, 189 P.3d 126 (2008) (police officer's testimony that victim was "'obviously traumatized'" and "'something was terribly wrong'" were permissible comments on victim's demeanor, not opinions about the victim's credibility or the defendant's guilt) (internal quotation marks omitted), quoting Answer to Pet. for Review at 15. None of the challenged statements by Detective Eviston constitute manifest constitutional error.

3.    Hearsay

Talavera argues that the trial court erred in admitting statements that M.H.S. made to forensic nurse Colette Dahl. Specifically, he challenges M.H.S.'s statement "I was bleeding. . . . I was so scared" and her identification of Talavera as the person who sexually abused her. RP (Dec. 14, 2016) at 573. He argues that the statements were hearsay and were not admissible pursuant to ER 803(a)(4), the exception for medical treatment or diagnosis.

But Talavera did not object to the statements below.[4] It is well settled that objections to evidence cannot be raised for the first time on appeal. See RAP 2.5(a); ER 103(a)(1); State v. Leavitt, 111 Wn.2d 66, 71-72, 758 P.2d 982 (1988). Because Talavera did not challenge the testimony below on hearsay grounds, he has waived the claim on appeal.

4.      Jury Unanimity

Talavera contends that his right to a unanimous verdict was violated when the prosecutor failed to elect specific acts for the jury's consideration. He argues that M.H.S. testified about approximately 13 acts of sexual abuse but that the State failed to elect the 4 acts on which the jury should rely to support the four counts of first degree child molestation.

The constitutional right to a jury trial requires that the jury be unanimous about the specific acts the defendant committed for each crime. State v. Petrich, 101 Wn.2d 566, 572, 683 P.2d 173 (1984). To ensure jury unanimity in multiple acts cases, either (1) the State must elect the particular criminal act on which it will rely for conviction or (2) the trial court must instruct the jury that all jurors must agree that the same underlying criminal act has been proved beyond a

---

[4] In a pretrial motion, the State sought to admit Dahl's testimony regarding "the victim's description of the crime" as "evidence of diagnosis or treatment." Clerk's Papers (CP) at 226; RP (Sept. 21, 2016) at 54. Defense counsel informed the court she had no objection to the State's motion. During Dahl's testimony, defense counsel made only one hearsay objection, to Dahl's recitation of the family's home address, arguing that it "[d]oesn't fall within the exception that we discussed for the purposes of medical." RP (Dec. 14, 2016) at 574.

reasonable doubt. <u>State v. Kitchen</u>, 110 Wn.2d 403, 411, 756 P.2d 105 (1988) (citing <u>Petrich</u>, 101 Wn.2d at 572).

Here, the trial court instructed the jury that "[t]o convict the defendant on any count of Child Molestation in the First Degree, one particular act of Child Molestation in the First Degree must be proved beyond a reasonable doubt, and you must unanimously agree as to which act has been proved." CP at 170. Because the jury was so instructed, there was no requirement that the State elect the specific acts it relied on for conviction.

5.    <u>Cumulative Error</u>

Talavera argues that cumulative error denied him a fair trial. "Under the cumulative error doctrine, [an appellate court] may reverse a defendant's conviction when the combined effect of errors during trial effectively denied the defendant [of his or] her right to a fair trial, even if each error standing alone would be harmless." <u>State v. Venegas</u>, 155 Wn. App. 507, 520, 228 P.3d 813 (2010). Because Talavera cannot show multiple errors affected the outcome at his trial, his cumulative error claim fails.

Affirmed.

WE CONCUR:

-15-