IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION ONE

| | | |
|---|---|---|
| THE STATE OF WASHINGTON, | ) | No. 78801-9-I |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | UNPUBLISHED OPINION |
| | ) | |
| DANIEL S. AMADOR, II, | ) | |
| | ) | |
| Appellant. | ) | |

BOWMAN, J. — Daniel S. Amador II appeals his conviction for multiple charges stemming from long-term sexual assault of his daughter A.A. Amador seeks reversal, arguing the trial court erred when it refused in camera review of counseling records. He also argues that the State elicited improper opinion testimony from several witnesses that resulted in a due process violation, prosecutorial misconduct, and ineffective assistance of counsel and that the court allowed irrelevant evidence in violation of a motion in limine. Finally, he claims cumulative error deprived him of his right to a fair trial. We affirm.

FACTS

Amador served as a Seattle Police Department officer for 21 years. Amador and his first wife Melanie[1] had two daughters, A.A. and C.A. The

___

[1] We refer to several parties by their first names for clarity and to protect the identity of the victims and mean no disrespect by doing so.

Citations and pin cites are based on the Westlaw online version of the cited material.

Amadors did not have a harmonious family dynamic. Amador frequently demeaned, belittled, and disrespected Melanie. As a form of disciplining the children, Amador often used a common police "takedown technique" known as "pinning." "Pinnings" involved "hold[ing] the girls down by their arms so they couldn't get up."[2]

Around the age of 10, the younger daughter C.A. began struggling emotionally. She started cutting herself in the seventh grade. C.A. had frequent "mood swings" and "outbursts." Amador would "pin" C.A. in order to bring her "back under control." In June 2013, C.A. expressed concern about the pinnings to her cousin. Her cousin alerted Child Protective Services (CPS), who opened an investigation. CPS interviewed C.A. and the other family members, who all denied any abuse by Amador. CPS recommended family counseling and individual counseling sessions for C.A., which she attended for a brief period of time. CPS concluded its investigation in September 2013 and determined any allegation of abuse or neglect was "unfounded."

In October 2014, Melanie learned Amador was having an affair. At that time, Amador moved in with his girlfriend Shannon. Amador and Melanie divorced in December 2015. Amador married Shannon in July 2016 and shortly thereafter, they had a daughter together.

Amador and Melanie's oldest daughter A.A. began dating Nicolas in July 2015 when she was 21 years old.[3] In January 2016, A.A. told Nicolas that

---

[2] According to testimony at trial, police officers sometimes use this takedown technique on their own children.

[3] Nicolas and A.A. married in July 2017.

someone close to her had "brainwashed" her and sexually abused her from a young age. A.A. did not disclose any details about the abuse. She said she never told anyone about the sexual abuse and asked Nicolas not to tell her parents.

Approximately a month later, A.A. gave Nicolas more details about the sexual abuse, which included multiple acts of rape. In March 2016, A.A. revealed to Nicolas that her father had been the one abusing her. Nicolas encouraged A.A. to tell her therapist, which she did. A.A. also told her younger sister C.A., who encouraged A.A. to inform the police. A.A. reported the sexual abuse to the police on April 1, 2016.

The State charged Amador with one count of domestic violence child molestation of A.A. in the first degree, one count of domestic violence child rape of A.A. in the second degree, one count of domestic violence child rape of A.A. in the third degree, and one count of incest with A.A. in the first degree. The State also charged Amador with one count of domestic violence child molestation of C.A. in the third degree. Amador moved to sever the counts related to A.A. from the count related to C.A. The trial court granted his motion to sever.

During trial, several witnesses testified about the overly affectionate relationship between Amador and A.A. Family friend Sandra McLaughlin testified that Amador and A.A. did not seem to have a "healthy relationship." Sandra said Amador had an "infatuation" with A.A. and "everything revolved around only" her.

Melanie testified similarly, saying Amador was "obsessed" with A.A., starting from the time she was 4 years old. Amador would buy A.A. whatever

she wanted and take only her on what he called "dates." He often described A.A. as beautiful or "hot." Melanie said that when A.A. turned 8 or 9 years old, Amador began showering with her. He continued this until A.A. moved out of the house at 19 years old. Melanie testified that she tried to confront Amador but he would not listen to her. She also testified that Amador would "make" A.A. take naps with him in his bed while he was nude. Although Melanie felt uncomfortable with this behavior, she never told anyone. When CPS became involved, Melanie minimized her concerns out of fear of losing her children.

C.A. also testified about her perceptions of the relationship between her father and A.A. Amador often told C.A. that A.A. was smarter and better behaved. He gave A.A. presents, took her on trips and outings, and "always had her by his side." C.A. testified that Amador showered with A.A. "[a]ll the time" from age eight or nine until A.A. moved out of the house during college. C.A. testified that Amador used the pinning technique on both her and A.A., but when he pinned A.A., it was usually in his bedroom with the door closed. C.A. said A.A. and Amador sometimes spent hours in his bedroom and when C.A. tried to enter the room, she found the door blocked by a dresser.

C.A. discussed the time her cousin reported the family to CPS based on her complaints about Amador's pinnings. C.A. testified Amador told her that because of her actions, CPS could take her away and he could lose his job so that he could no longer afford to pay for school. Amador told C.A. she "would be messing up both [girls'] futures" and responsible for ruining the family. C.A.

testified that when she spoke with the CPS investigator, she minimized the problems in the family so she "wouldn't be in trouble."

A.A. testified about her relationship with Amador. A.A. said Amador treated her far better than her mother or sister. He bought her gifts and took her out on what he referred to as "dates," including nice restaurants, shopping, and the theater. She also described pinnings from an early age. A.A. said the pinnings occurred "usually every day." When she was 9 years old, Amador would pin her on his bed and put his hand on her breast or bottom and "just talk." He also started "coming into the bathroom while [she] was showering" and getting into the shower with her. Amador would make her touch his penis "in his bedroom or in the bathroom." A.A. testified that by age 11, Amador was touching her genitals and performing oral sex on her. Amador also forced A.A. to perform oral sex on him and give him "handjob[s]." At age 12, the sexual abuse escalated to anal sex.

A.A. testified the sexual abuse was "confusing" and she "thought it was what I . . . was supposed to be doing." Amador told A.A. that it was their "secret relationship" and that all daughters that have a close relationship with their father "get pinned by their dad." A.A. testified that she trusted Amador and as she got older, he convinced her she "was responsible" for the sexual abuse. A.A. said, "It was just like one, like, 15-year-long nightmare instead of individual times. It was my normal." A.A. testified she "didn't tell anybody" about the abuse because she was "scared" and "thought it [was] my fault." But when she started college, A.A. "was just thinking about it all the time, like, every day realizing more and more

that it had been, like, so wrong." A.A. started suffering from depression, anxiety, and nightmares and "just wanted to talk about it with someone," so she confided in Nicolas, then her therapist and sister soon thereafter.

A.A. testified she decided to report the sexual abuse to the police only after she confronted Amador about it. A.A. said Amador "agreed" he "messed up" and told her he "shouldn't have done that." But Amador kept "making sure, you're not going to tell anybody, right?" A.A. had an "unsettling" feeling that he was apologizing only because he "didn't want to get in trouble," not because he hurt her. A.A. also knew Amador's new wife Shannon was about to give birth to a girl and was concerned Amador would do the same thing to her half-sister.

The jury found Amador guilty on the four counts related to A.A. Amador then entered an Alford[4] plea to an amended charge of fourth degree assault of C.A. with sexual motivation. The court imposed a concurrent indeterminate sentence at the high end of the standard sentencing range of 280 months to life.

ANALYSIS

Amador appeals the four convictions related to A.A., arguing the trial court erred when it refused in camera review of C.A.'s counseling records; the State elicited improper opinion testimony from several witnesses that resulted in a due process violation, prosecutorial misconduct, and ineffective assistance of counsel; the court erred in allowing irrelevant and improper testimony in violation of a motion in limine; and cumulative error deprived him of his right to a fair trial.[5]

---

[4] North Carolina v. Alford, 400 U.S. 25, 91 S. Ct. 160, 27 L. Ed. 2d 162 (1970).

[5] Amador does not appeal his conviction of fourth degree assault of C.A. with sexual motivation.

In Camera Review of Counseling Records

During discovery, Amador filed a notice of intent to subpoena C.A.'s counseling and medical records. C.A. moved for a protective order. Amador then requested in camera review of the records. Among the documents sought were records from Group Health Cooperative counselor William Norris, who worked briefly with C.A. during the CPS investigation in 2013. Amador claimed the records would "shed light" on C.A.'s mental state at the time of the CPS investigation and were "critical" to preparing a defense. In particular, Amador argued the records "undoubtedly" contained exculpatory evidence because C.A. had disavowed any sexual molestation by her father during the 2013 CPS investigation. According to Amador, the counseling records likely contained "further evidence of [C.A.]'s recantations, and likely with more detail."

The trial court acknowledged that the records could have some material value. However, it concluded that Amador had other means of accessing the same information, including an interview C.A. gave to CPS before engaging in counseling that "really lays out what she was thinking." As a result, the court determined that C.A.'s privacy interest in her counseling records outweighed the usefulness of the evidence. The trial court issued an order granting C.A.'s motion for a protective order as to her medical and counseling records, denied Amador's motion for in camera review, and quashed any subpoenas for those records.

On appeal, Amador claims the trial court's failure to conduct an in camera review of the records deprived him of the due process right to prepare and

present a defense.  The State argues the trial court properly denied review of the privileged records given the low probability that they contained information beyond that already provided to the defense.

Due process provides a criminal defendant "a right of access to evidence that is 'both favorable to the accused and material to guilt or punishment.' " State v. Knutson, 121 Wn.2d 766, 772, 854 P.2d 617 (1993) (quoting Pennsylvania v. Richie, 480 U.S. 39, 57, 107 S. Ct. 989, 94 L. Ed. 2d 40 (1987)).  Mental health counseling records are privileged under RCW 5.60.060(9),[6] requiring the court to balance the privacy interest in those records with the usefulness of the evidence. See CrR 4.7(e); State v. Kalakosky, 121 Wn.2d 525, 547, 852 P.2d 1064 (1993) (citing the Victims of Sexual Assault Act, chapter 70.125 RCW).  "[T]o obtain in camera review of privileged records a defendant must establish that the records are at least material."  State v. Diemel, 81 Wn. App. 464, 468, 914 P.2d 779 (1996); see Richie, 480 U.S. at 57; Kalakosky, 121 Wn.2d at 550.  This involves a " 'plausible showing' " that the evidence is both material and favorable.  State v. Gregory, 158 Wn.2d 759, 791, 147 P.3d 1201 (2006)[7] (quoting Richie, 480 U.S. at 58 n.15), overruled in part on other grounds by State v. W.R., 181 Wn.2d 757, 336 P.3d 1134 (2014).

Materiality requires a reasonable probability that the evidence would impact the outcome of a trial.  Gregory, 158 Wn.2d at 791.  "A reasonable

---

[6] We note the legislature has amended RCW 5.60.060 several times since 2013.  LAWS OF 2016 Spec. Sess., ch. 24, § 1; LAWS OF 2016 Spec. Sess., ch. 29, § 402; LAWS OF 2018, ch. 165, § 1; LAWS OF 2019, ch. 98, § 1; LAWS OF 2020, ch. 42, § 1.  None of the amendments changed the language of subsection (9).

[7] Internal quotation marks omitted.

probability is a probability sufficient to undermine confidence in the outcome."

Gregory, 158 Wn.2d at 791. The defendant must demonstrate more than a mere

possibility of materiality. State v. Knutson, 121 Wn.2d 766, 773, 854 P.2d 617

(1993). "A claim that privileged files might lead to other evidence or may contain

information critical to the defense is not sufficient to compel a court to make an in

camera inspection." Diemel, 81 Wn. App. at 469.

We review the decision whether to conduct in camera review of evidence

for abuse of discretion. Diemel, 81 Wn. App. at 467. A trial court abuses its

discretion when it bases its decision on untenable grounds or reasons. State v.

Vars, 157 Wn. App. 482, 494, 237 P.3d 378 (2010). This standard of review

allows the trial court to act within a range of acceptable choices. State v.

Sisouvanh, 175 Wn.2d 607, 623, 290 P.3d 942 (2012). We will not find an abuse

of discretion merely because we would have decided the issue differently. L.M.

v. Hamilton, 193 Wn.2d 113, 134-35, 436 P.3d 803 (2019). Here, the trial court's

decision to deny in camera review of C.A.'s medical and counseling records was

within a range of acceptable choices.

In his petition for in camera review, Amador argued:

> The CPS records contain evidence that [C.A.]'s mental state
> influenced her perception of events and of recantation at the time
> the original allegation was made. When [C.A.]'s depression was
> properly treated, her perception of the pinnings and Mr. Amador's
> intent changed to the point where governmental involvement was
> no longer necessary. It stands to reason that records with her
> counselor and prescribing doctor would contain additional
> discussions about the pinnings and [C.A.]'s perception of them.

We disagree with Amador's argument. C.A.'s counseling records pertain

to the very short period of time when she saw Norris for individual counselling

9

related to depression.[8]  C.A. infrequently met with Norris and she later stated that she "didn't really talk to him because I didn't like him."  Therefore, any conclusion as to what C.A. discussed with Norris during this time period is speculation.

In addition, the likelihood that C.A.'s counselling records would have provided Amador with any relevant information about A.A.'s allegations is low.  C.A. was unaware that the pinnings A.A. experienced were sexual in nature or that Amador had sexually assaulted A.A. in any manner until years after the counseling sessions.  Furthermore, any additional information the records may have revealed about C.A.'s description of the pinnings would have been of little value.  Amador was in possession of C.A.'s lengthy interview with CPS in which she minimized Amador's actions and blamed her perception of his actions on her struggle with depression.  Amador had ample evidence to impeach C.A. in that regard.  Disclosure of the records would not have affected the outcome of the proceedings.  See In re Pers. Restraint Petition of Rice, 118 Wn.2d 876, 887, 828 P.2d 1086 (1992).

We conclude the trial court properly weighed the competing interests and did not abuse its discretion in denying Amador's motion for in camera review of C.A.'s medical and counseling records.

Opinion Testimony

Amador argues the State deprived him of a fair trial by soliciting improper opinion evidence of witness credibility.  Amador raises a due process violation

---

[8] C.A. had her first counselling session with Norris on July 2, 2013.  The record mentions a subsequent scheduled visit in August.  The record contains little evidence of additional counselling with Norris and Amador conceded that C.A. did not receive continuous counseling with Norris.

argument as well as prosecutorial misconduct and ineffective assistance of counsel arguments related to the witness testimony.

A witness may not "testify to his [or her] opinion as to the guilt of a defendant, whether by direct statement or inference." State v. Black, 109 Wn.2d 336, 348, 745 P.2d 12 (1987). Nor may a witness give an opinion as to another witness' credibility. State v. Carlson, 80 Wn. App. 116, 123, 906 P.2d 999 (1995). Indeed, the Washington Supreme Court has held that "expressions of personal belief, as to the guilt of the defendant, the intent of the accused, or the veracity of witnesses" is clearly inappropriate for opinion testimony in criminal trials. State v. Montgomery, 163 Wn.2d 577, 591, 183 P.3d 267 (2008). Such testimony may constitute reversible error because it "violates the defendant's constitutional right to a jury trial, which includes the independent determination of the facts by the jury." State v. Quaale, 182 Wn.2d 191, 199, 340 P.3d 213 (2014).

Amador asserts the State elicited improper witness testimony by asking Nicolas, Melanie, and family friend Sandra whether they supported A.A.'s decision to report her allegations to law enforcement. Without objection, all three witnesses responded, "Yes."

Nicolas testified:

Q. Did you at some point learn that [A.A.] had decided to officially report [the sexual abuse] to law enforcement?
A. Yes.
Q. And were you a part of that decision, or was it just kind of something she said, "Hey, I'm going to do this"?
A. We had talked about it, and she had . . . come to the decision, and that was most — that made most sense to her, that she thought would be best.

Q. And once she made that decision, did you support her in it?
A. Yes.

Melanie testified:

Q. . . . Did [A.A.] tell you at some point . . . that she had made the decision to report [the sexual abuse] to the police?
A. Yes.
Q. And were you supportive of that decision?
A. Yes.
Q. Would you have been supportive if she made a different one?
A. Yes.

And Sandra testified:

Q. Did you later learn that [A.A.] had made the decision to report [the sexual abuse]?
A. Yes.
. . . .
Q. Did you support that decision?
A. I did.

Amador also alleges the State elicited improper opinion testimony from Amador's close friend and Sandra's husband Thomas McLaughlin, whom the State asked whether he had maintained contact with Amador since the allegations. Without objection, Thomas testified he had not. Thomas testified:

Q. Since [A.A. disclosed the sexual abuse], have you and your wife remained friends with Melanie?
A. Yes.
Q. Have you remained friends with [A.A.]?
A. Yes.
Q. Have you remained friends with [C.A.]?
A. Yes.
Q. Have you remained friends with the defendant?
A. I have not talked to him since.

Due Process

Amador asserts the State violated his constitutional right to due process by eliciting the witness testimony. But Amador did not object to any of the

12

alleged opinion testimony during trial. As a general rule, appellate courts will not review an issue raised for the first time on appeal. RAP 2.5(a). However, a party may raise manifest error affecting a constitutional right for the first time on appeal. RAP 2.5(a)(3). In order to demonstrate manifest constitutional error, the appellant must make a plausible showing that the asserted error had practical and identifiable consequences in the trial. State v. A.M., 194 Wn.2d 33, 38, 448 P.3d 35 (2019).

Despite the clear prohibition of opinion testimony on credibility, "[a]dmission of witness opinion testimony on an ultimate fact, without objection, is not automatically reviewable as a 'manifest' constitutional error." State v. Kirkman, 159 Wn.2d 918, 936, 155 P.3d 125 (2007). In such cases, manifest error requires a showing that the testimony was "an explicit or almost explicit witness statement" that the witness believed the victim's accusations. Kirkman, 159 Wn.2d at 936. This requirement "is consistent with our precedent holding the manifest error exception is narrow." Kirkman, 159 Wn.2d at 936. Opinion testimony "relating only indirectly to a victim's credibility" does not rise to the level of manifest constitutional error. Kirkman, 159 Wn.2d at 922.

Nicolas, Melanie, and Sandra testified that they supported A.A.'s decision to speak with law enforcement. Thomas testified that he and Sandra had remained friends with Melanie, A.A., and C.A. but had not remained friends with Amador. None of the witnesses directly testified that Amador was guilty or expressly asserted that they believed A.A.'s version of events. Although a juror could infer from their testimony that the witnesses believed A.A.'s allegations

credible and worthy of reporting to law enforcement, inferences do not rise to the level of manifest constitutional error.

Nonetheless, even if the testimony amounted to nearly explicit opinions on credibility and guilt, in context of the entire trial, any error was not so prejudicial as to create practical and identifiable consequences in the outcome of the trial. The State presented overwhelming evidence that Amador sexually abused A.A. over many years. Additionally, the court properly instructed the jury on its role in assessing credibility[9] and we presume the jury follows the court's instructions. State v. Lough, 125 Wn.2d 847, 864, 889 P.2d 487 (1995). As a result, the error was not manifest and we will not review it for the first time on appeal.

Prosecutorial Misconduct

Amador claims the State committed prosecutorial misconduct by repeatedly soliciting the improper opinion testimony discussed above. The State argues Amador cannot meet the heightened requirements for prosecutorial misconduct where he failed to object at trial. We agree with the State.

To establish prosecutorial misconduct, a defendant must demonstrate that the conduct was both improper and prejudicial in the context of the entirety of the record and the circumstances at trial. State v. Magers, 164 Wn.2d 174, 191, 189 P.3d 126 (2008). Where, as here, the defendant fails to object at trial, the error is waived absent misconduct so flagrant and ill intentioned that an instruction could not have cured the resulting prejudice. State v. Emery, 174 Wn.2d 741, 760-61,

---

[9] Jury instruction 1 provides, "You are the sole judges of the credibility of each witness. You are also the sole judges of the value or weight to be given to the testimony of each witness." It then provides a number of factors a juror may consider in evaluating a witness' testimony.

278 P.3d 653 (2012). To demonstrate this level of misconduct, "the defendant must show that (1) 'no curative instruction would have obviated any prejudicial effect on the jury' and (2) the misconduct resulted in prejudice that 'had a substantial likelihood of affecting the jury verdict.' " Emery, 174 Wn.2d 761 (quoting State v. Thorgerson, 172 Wn.2d 438, 455, 258 P.3d 43 (2011)).

Had Amador objected to the first instance of alleged opinion testimony, the trial court could have evaluated the admissibility of the testimony and issued a curative instruction if needed. Amador cannot show that an instruction would not have cured or avoided any prejudice. Because we presume jurors follow instructions from the court, a curative instruction would have alleviated any prejudice from the testimony. See State v. Dye, 178 Wn.2d 541, 556, 309 P.3d 1192 (2013). Furthermore, a timely objection would have deterred the State from eliciting similar testimony from subsequent witnesses. Accordingly, Amador fails to demonstrate the flagrant and ill-intentioned misconduct necessary for his prosecutorial misconduct claim.

Ineffective Assistance of Counsel

Amador argues he received ineffective assistance of counsel because counsel repeatedly failed to object to the opinion testimony. To prove ineffective assistance of counsel based on failure to object, a defendant "must show that not objecting fell below prevailing professional norms, that the proposed objection would likely have been sustained, and that the result of the trial would have been different if the evidence had not been admitted." In re Pers. Restraint Petition of

15

<u>Davis</u>, 152 Wn.2d 647, 714, 101 P.3d 1 (2004).[10]  Courts engage in a strong presumption of effective representation.  <u>State v. McFarland</u>, 127 Wn.2d 322, 335, 899 P.2d 1251 (1995).  For a successful claim of ineffective assistance of counsel, a defendant must establish both objectively deficient performance and resulting prejudice.  <u>Emery</u>, 174 Wn.2d at 754-55.

Regardless of whether counsel should have objected, Amador is unable to demonstrate prejudice.  Prejudice requires "a reasonable probability that, except for counsel's unprofessional errors, the result of the proceeding would have been different."  <u>McFarland</u>, 127 Wn.2d 335.

A.A. gave detailed testimony about the sexual abuse she suffered and how it progressed over several years.  C.A. and Melanie substantiated this evidence with testimony that until A.A. moved out of the house during college, Amador forced A.A. to shower with him, took naps with her in the nude, and used a dresser to block the bedroom door while he "pinned" her.  Melanie, C.A., and Sandra also detailed Amador's almost obsessive devotion to A.A., including taking her on "dates," keeping her with him at all times, and describing her as "hot."  This evidence amply supports the credibility of A.A.'s allegations.  Given the overwhelming evidence presented at trial, Amador cannot demonstrate the prejudice required for ineffective assistance of counsel.

<u>Violation of Motion in Limine</u>

Prior to trial, Amador moved in limine to prohibit evidence of the "perceived youthfulness" of his wife Shannon.[11]  The trial court agreed, noting the

---

[10] Footnotes omitted.

[11] Shannon is six years older than A.A.

16

evidence to be highly prejudicial, not relevant, and "close to profile evidence about Mr. Amador."

Despite the court's ruling, the State asked Shannon on cross-examination, "How close in age are you to [A.A.]?" Amador objected to the testimony as a violation of the motion in limine. The court recessed to hear from the parties. During this discussion, the court characterized the motion in limine as a "motion to exclude testimony commenting on Shannon Amador's perceived youthful appearance." Over defense's objection, the court allowed the testimony on cross-examination, concluding that the motion in limine was "to exclude testimony about perceived youthfulness, which isn't the question that was asked."

Amador argues the trial court mistakenly admitted this "irrelevant and inflammatory profile evidence." The State disagrees that the testimony amounted to "profile" evidence and claims harmless error. We conclude this evidence was irrelevant and improperly admitted but the error was harmless.

"Evidence which is not relevant is not admissible." ER 402. "Relevant evidence" is evidence having "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." ER 401. The appellate court reviews evidentiary decisions for abuse of discretion. Vars, 157 Wn. App. at 494.

Nothing about Shannon's age or similarity in age to A.A. had "any tendency to make the existence of any fact that is of consequence to the determination of" whether Amador sexually abused A.A. "more probable or less

probable" as required for relevant evidence under ER 401. The evidence was not relevant and should have been excluded.

However, improperly admitted evidence may amount to harmless error. See State v. Neal, 144 Wn.2d 600, 611, 30 P.3d 1255 (2001). Evidentiary error requires prejudice for reversal. Neal, 144 Wn.2d at 611. "An error is prejudicial if, 'within reasonable probabilities, had the error not occurred, the outcome of the trial would have been materially affected.' " Neal, 144 Wn.2d at 611 (quoting State v. Smith, 106 Wn.2d 772, 780, 725 P.2d 951 (1986)). Improperly admitted evidence is harmless if it is of minor significance in relation to the evidence as a whole. Neal, 144 Wn.2d at 611.

Shannon's similarity in age to A.A. is unlikely to have materially affected the outcome of the trial. Shannon testified in person. Her "perceived youthfulness" was visible to the jury. Furthermore, the State did not otherwise raise or argue the issue of Shannon's age. The testimony played a minimal role in relation to the evidence at trial. Admission of this irrelevant evidence was harmless error.

Cumulative Error

Amador argues for reversal under the cumulative error doctrine. The cumulative error doctrine requires reversal when the combined effect of several errors denies the defendant a fair trial. State v. Weber, 159 Wn.2d 252, 279, 149 P.3d 646 (2006). "The doctrine does not apply where the errors are few and have little or no effect on the outcome of the trial." Weber, 159 Wn.2d at 279. Here, the admission of the testimony as to Shannon's similarity in age to A.B and defense counsel's failure to object to the solicitation of alleged improper opinion

evidence were not prejudicial.  Because these errors had no effect on the outcome of the trial, cumulative error does not apply.

We affirm the jury convictions of one count of domestic violence child molestation of A.A. in the first degree, one count of domestic violence child rape of A.A. in the second degree, one count of domestic violence child rape of A.A. in the third degree, and one count of incest with A.A. in the first degree.

WE CONCUR: