IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 38643-1-III |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | UNPUBLISHED OPINION |
| | ) | |
| CHARLES ALLEN MOORE, | ) | |
| | ) | |
| Appellant. | ) | |

LAWRENCE-BERREY, J. — A jury convicted Charles Moore of three counts of rape

of a child in the first degree. He raises three arguments for granting him a new trial, one

argument for reducing his sentence, and one scrivener's error. We reject his arguments,

except we remand for correction of the scrivener's error in Mr. Moore's judgment and

sentence.

FACTS

G.G.[1] was born in 2012. That same year, his mother, A., met Charles Moore, and

they soon began a relationship and married in 2018. A. had three daughters in addition to

_____

[1] We use initials to protect G.G.'s privacy. Gen. Order 2012-1 of Division III, *In re Use of Initials or Pseudonyms for Child Victims or Child Witnesses*, (Wash. Ct. App. June 18, 2012), https://www.courts.wa.gov/appellate_trial_courts/?fa=atc. genorders_orddisp&ordnumber=2012_001&div=III. Because identification of close family members could lead to the identity of G.G., we also refer to his relatives with initials.

G.G., Mr. Moore had three sons, and they had a daughter together. Due to the couple's work schedules, Mr. Moore was the primary parent at home during the day.

Mr. Moore was a strict parent. He required the children to contribute to the household by doing chores. When the children got in trouble, they were punished by being confined to their rooms, standing in time out, performing exercise, or being spanked. G.G. was often in trouble for stealing food and lying about it. Because he would not stay in his bedroom as instructed, a lock was placed on the outside of his bedroom door to enforce his confinement.

On July 5, 2019, G.G., who was then six years old, had been locked in his bedroom since the previous day. While the adults were out of the house, his oldest sister, A.G., came to check on him. She noticed a mark on his face and asked him what had happened. He told her that Mr. Moore had struck him. When she asked if anything else had happened, G.G. disclosed Mr. Moore had been sexually abusing him. A.G. called family to pick them up, and G.G. disclosed the abuse to his aunt and grandmother. After contacting the police, G.G. was brought to the hospital for examination.

*Forensic interview with G.G.*

While G.G. was at the hospital, Detective Anthony Lamanna conducted a forensic interview about the abuse. G.G.'s aunt, Q., was in the room during the interview. Q. and

2

Detective Lamanna sat on opposite sides of the hospital bed; for most of the interview, G.G. faced Detective Lamanna and could not see Q.

After some introductory questions, the detective asked G.G. if there was someone in particular G.G. did not want to be around. G.G. responded that he did not want to be around Mr. Moore because he was "a little . . . inappropriate." Ex. P-7, at 9.[2] When prompted to explain what he meant by "inappropriate," G.G. explained:

> So sometimes while the girls are outside and my mom is at work [Mr. Moore], he tells me to go in his room and then, um, so I go in his room and then he tells me to take off my clothes and I take off my clothes and all I do then is go in my bedroom and lay down, like—like this and then I—I do that and then . . . .
> . . . .
> And then, uh, I do that and then sometimes [Mr. Moore] puts his, um, thing in my butt and then sometimes I have to suck on his thing and it's—makes me uncomfortable, like—like not wanting me to not say he's mean but I just—just don't want to say it.

*Id.* at 10. While explaining to the detective, G.G. demonstrated that he would lie face down. When prompted, G.G. explained that by "his thing," he meant Mr. Moore's penis. *Id.* When asked what it felt like when that happened, G.G. described it feeling like "something's spiked to it," noting that "nothing's spiked but it feels like it . . . ." *Id.* He later compared the feeling to being like stepping on broken glass.

---

[2] All exhibits referenced are from the pretrial child competency and hearsay hearing on June 10, 2021.

Unprompted, G.G. described that sometimes Mr. Moore would put an object in his

(G.G.'s) butt, demonstrating for the detective how he would be positioned. He described

it as a glass bulb with colored circles stuck to it that were "red, white . . . pinkish, teal."

*Id.* at 11. G.G. drew Detective Lamanna a picture of the object. When G.G. said,

"'Ow,'" Mr. Moore would say, "'shut the fuck up.'" *Id.* at 12. He did not know exactly

where Mr. Moore kept the object because he would be face down on the bed when Mr.

Moore used it, but he had heard a drawer opening sometimes. He remembered the last

time it happened was five days before the interview.

In addition to Mr. Moore putting the object in G.G., G.G. would "have to suck

his—and then he shows me videos of how to do it." *Id.* at 16. Mr. Moore would show

him videos of adult women performing oral sex on adult men. G.G. explained and

demonstrated in detail how Mr. Moore instructed him to perform oral sex. G.G. had

thrown up once and had felt like he was going to throw up other times. When he told Mr.

Moore he was going to throw up, Mr. Moore told him to throw up into a towel. Mr.

Moore kept a towel under himself because sometimes he would shake his thing and pee

would come out. The pee was "white but yellow" and Mr. Moore would hold G.G.'s

head down so G.G. would get pee all over his face and make G.G. stick his tongue out.

4

*Id.* at 22. G.G. again demonstrated for the detective how Mr. Moore would shake his thing and hold G.G.'s head down.

G.G. remembered still being six years old when the abuse started and specifically recalled it beginning on March 27, the day of a friend's birthday. The abuse only happened in Mr. Moore's room with the door locked. G.G. said that Mr. Moore had never said anything about not telling anybody else, and G.G. was not sure if Mr. Moore wanted him to tell. He had only told his sister when she asked that morning. No one other than Mr. Moore had ever done anything like that to G.G.

*Search warrant and charges*

Based on G.G.'s statements during the interview, police arrested Mr. Moore and charged him with three counts of rape of a child in the first degree and one count of fourth degree assault, for the bruise under G.G.'s eye.[3] Each count of rape of a child included two aggravating factors: that G.G. was a particularly vulnerable victim and that the offense was part of an ongoing pattern of sexual abuse. Pursuant to a search warrant, the police found a glass sex toy with multi-colored dots in a drawer in Mr. Moore's bedroom.

---

[3] The information was later amended to modify the date alleged for the fourth degree assault.

*Child hearsay hearing*

Before trial, Mr. Moore moved to exclude G.G.'s hearsay statements because G.G. lacked competency and the statements lacked indicia of reliability.  Mr. Moore argued G.G. had a motive to lie about the abuse because Mr. Moore's "consistent role as disciplinarian created resentment in all of the children, including G.G."  Clerk's Paper's (CP) at 78.  He argued that G.G. had a history of lying, and his statements were unreliable because they were made under pressure, "following prompting over the short period of . . . several hours."  CP at 78.  He similarly argued the statements were not spontaneous because they were in response to questioning, and G.G.'s family was predisposed to believe abuse had happened.

*Evidence*

The week before trial, the court held a hearing to determine whether G.G. was competent as a witness and whether to admit G.G.'s statements to his sister, aunt, grandmother, and Detective Lamanna.  The court heard testimony from various family members and the detective.

*G.G.'s sisters*

A.G., G.G.'s oldest sister, was 16 years old at the time of the hearing.  She described G.G. as getting into trouble with Mr. Moore for "[l]ying, stealing food, going,

like, into their room without permission, going into our room without permission, stuff like that." 1 Rep. of Proc. (RP) (June 10, 2021) at 31. She recalled him being spanked at their previous house but not as much after they moved to their current house. G.G. and Mr. Moore's sons were often made to exercise or to go to their rooms, where they could not leave except to go to the bathroom. She recalled one time G.G. had lied about something and, as punishment, he had to step up and down on a crate in the garage until Mr. Moore told him he could stop. She remembered G.G. doing this until he cried. A.G. testified, however, that the children did "[n]ot really" have a lot of chores and were able to do what they wanted, provided they asked beforehand and it was reasonable. 1 RP (June 10, 2021) at 42.

A.G. recalled instances where Mr. Moore would be alone in the house with G.G., either because he dropped the other children off and picked them up later or told the other children to stay outside for a certain time frame, such as two hours. She once came inside during one of those occasions and saw G.G. and Mr. Moore watching a movie in Mr. Moore's bedroom. Another time, she tried to enter Mr. Moore's room and the door was locked and a movie was "blasting." 1 RP (June 10, 2021) at 34.

A.G. testified that she would check on G.G. when he was confined to his room but would get in trouble for doing so. On July 5, 2019, she went to check on G.G. after the

7

adults left the house.  She noticed a mark under his eye and asked G.G. what had

happened.  He told her Mr. Moore had hit him, and A.G. asked if there was anything else

that was happening.  G.G. then disclosed that Mr. Moore was abusing him.  A.G recalled:

> [G.G] had told me that [Mr. Moore] would have him suck his, and then he
> pointed to his private area.  And then he said [Mr. Moore] would put stuff
> inside of him and he didn't know if it was, and he pointed again, or if it
> was, like, an object or something (indicating).  And then he also talked
> about having to lay on the bed with a towel under him and having soap on
> his body.  And he also talked about [Mr. Moore] sucking his, and then he
> pointed again (indicating).  He also said that [Mr. Moore] would laugh at
> him about that.  I remember that too.

1 RP (June 10, 2021) at 35-36.

She recalled G.G. telling her that when he told Mr. Moore it hurt, Mr. Moore "had

told him to shut the 'F' up."  1 RP (June 10, 2021) at 36.  G.G. told her something was

"stuck into his butt, but he didn't know if it was an object or if it was his private part,

[Mr. Moore's] private part."  1 RP (June 10, 2021) at 36-37.

A.G. testified that G.G. did not want her to tell Mr. Moore: "He was crying and

begging me not to tell him.  He was really scared about that."  1 RP (June 10, 2021) at 37.

 She recalled him telling her not to tell Mr. Moore about 10 times.  One or two nights

later, G.G. brought up again that he did not want A.G. to tell Mr. Moore: "[H]e was still

scared, that he didn't want me to tell anybody.  Well, like, [Mr. Moore]."  1 RP (June 10,

8

2021) at 39.  He told her this another three or four times.  After that conversation, A.G. had not spoken with G.G. about the abuse.

A.G. testified that she had not suggested any sexual abuse had occurred or provided any sexual terms to G.G.  She recalled their conversation lasting no more than 20 minutes.  After the conversation, she called her grandmother because she "didn't trust calling my mom at the time."  1 RP (June 10, 2021) at 37.  A.G. recalled being present at Q.'s house when G.G. told their grandmother about the abuse but could not recall what was said.  She was not present when G.G. spoke with Q., but saw him speak with her alone.  She recalled speaking with Q. about the abuse later but not that day.

M.G., G.G.'s third oldest sister, was 11 years old at the time of the hearing.  She testified that Mr. Moore was strict and would send them to their rooms when he got mad.  She could not recall what G.G. would get in trouble for but remembered that he would be punished by standing in the corner or being sent to his room.  She recalled G.G. lying "often," but about "small things."  1 RP (June 10, 2021) at 83-84.  She testified that Mr. Moore would send all the siblings except G.G. out of the house, telling them he needed them to play outside.

9

*G.G.'s mother*

A. testified that G.G. had "a great relationship" with Mr. Moore. 1 RP (June 10, 2021) at 86. She described Mr. Moore as a "very active" parent and stepparent who was involved in the children's school events. 1 RP (June 10, 2021) at 88. However, he had "rules and expectations" for the children and expected them to contribute to the household in age-appropriate ways. 1 RP (June 10, 2021) at 101.

A. described putting a lock on G.G.'s door shortly before July 5, 2019, because he would sneak out of his room in the middle of the night and steal food from the pantry or get into his sisters' belongings. She testified that G.G. is "constantly in trouble," and that usual punishments were time out or being put in his room. 1 RP (June 10, 2021) at 91. She recalled G.G. getting into trouble with Mr. Moore's sons and them having to do push-ups as punishment. She testified that "[t]hey actually started to enjoy it, so it wasn't really . . . a punishment anymore." 1 RP (June 10, 2021) at 93.

A. recalled one incident where G.G. had lied to his teacher about an uncle dying in order to explain his bad behavior, which A. discovered when the teacher called to offer her condolences. She described him stealing chocolate bars from his sisters and lying even after she found the wrappers in his room. In another incident, a family friend had

told A. that G.G. took money from their safe and took their son's wallet. A. found the wallet and money in G.G.'s backpack, and G.G. claimed not to know how it got there.

Prior to his disclosures on July 5, 2019, G.G. had never made any allegations of sexual abuse against anybody. G.G. had never mentioned the abuse to A., and she had never tried to ask him about it.

### G.G.

G.G. was eight years old at the time of the hearing. G.G. testified that Mr. Moore was a strict stepfather and made them do chores like taking out the trash. He remembered getting in trouble when he woke up early and made too much noise and having to go up and down on a box in the garage. He would also have to stay in his room for a day, although his sister or someone else would bring him food. However, G.G. also recalled playing Xbox with Mr. Moore, particularly LEGO® Marvel.

G.G. remembered talking to Detective Lamanna at the hospital and testified that he had told the truth then. G.G. confirmed that Mr. Moore did things to his body that he did not like but did not answer or could not remember when asked for details. He confirmed that he had been alone with Mr. Moore in Mr. Moore's bedroom. He confirmed that his clothes had come off during that time, and he had seen Mr. Moore's private part. He remembered telling Detective Lamanna that Mr. Moore put things in his butt and

11

confirmed he was telling the truth, but did not remember telling Detective Lamanna that

Mr. Moore made him suck on his thing or put his thing in G.G.'s butt.

G.G. remembered telling A.G. about the abuse before Detective Lamanna: "It was

kind of hard for me to tell her, and then she was, like, It's okay, [G.G.], and then I just

told her."  1 RP (June 10, 2021) at 66.  G.G. did not know why it was hard to tell her, but

he had told her the truth.

G.G. testified that he got in trouble "50/50" for lying, confirming that half the time

he got in trouble was for lying.  1 RP (June 10, 2021) at 69.  He denied taking anything

out of his mother's and Mr. Moore's room.  He had gotten in trouble at school for kicking

the ball onto the roof during kickball.  He did not remember telling his teacher that his

uncle had died.  He testified that he had not stolen a wallet from his friend; rather, his

friend had given him the wallet, although he could not remember why.  He denied getting

in trouble for stealing from his sisters.  He testified that he had taken things back from his

sisters that were his.

*G.G.'s aunt*

G.G.'s aunt Q. testified that before July 5, 2019, she would see G.G. and his

siblings often, and they would come to her house to play.  She had an excellent

relationship with G.G.  She had first met Mr. Moore in 2013 at her wedding, but he had

12

only been to her house once.  She described their relationship as "cordial."  1 RP

(June 10, 2021) at 131.  Q. did not have problems with G.G. lying; while he might lie

about small things, "it was never anything important."  1 RP (June 10, 2021) at 130.

On July 5, 2019, Q. left work when she got her mother's call and picked up the

children from a neighbor's house, where A.G. had taken them.  She could not recall her

mother's exact words, but recalled that her mother was emotional and told her that A.G.

had told her that G.G. had been abused by Mr. Moore.  Q. told A.G. she was glad she

called for help but did not discuss it further because she assumed the allegations were

sexual in nature.

After they arrived at her house, Q. spoke with G.G. individually.  Q. testified that

when she asked G.G. why A.G. had called their grandmother, he said it was because Mr.

Moore had hit him in the face.  When she asked if there was anything else, G.G. was

hesitant, but eventually told Q. that Mr. Moore made him "suck his dick."  1 RP (June 10,

2021) at 133.  Q. asked if that had happed before, and G.G. told her it had.  After Q. told

G.G. she was sorry that had happened to him, G.G. told her that sometimes Mr. Moore

"puts it in his butt."  1 RP (June 10, 2021) at 133.  He told her that when he told Mr.

Moore to stop, Mr. Moore told him to shut up.

13

Q. recalled the conversation lasting less than five minutes.  She did not suggest any

sexual content to G.G., and he used his own words to describe what happened.  After that

day, G.G. had not made further disclosures to Q. and she had not asked him questions

about it.

*G.G.'s grandmother*

G.G.'s grandmother M. testified that she had a close relationship with her

grandchildren, including G.G.  She recalled that G.G. would lie about "silly things," like

whether he had brushed his teeth, but there was nothing that stuck out to her about his

lies.  1 RP (June 10, 2021) at 145.  M. believed that G.G. "could never do anything right

in his mother's eyes."  1 RP (June 10, 2021) at 154.  She did not have any problems with

his behavior when he was at her house that she could not solve by talking with him.  M.

had issues with Mr. Moore's parenting style and thought he was too strict.  After Mr.

Moore entered the picture, she did not see her grandchildren as much.

On July 5, 2019, she recalled A.G. calling while "hysterically crying" and asked

M. to come get them.  1 RP (June 10, 2021) at 146.  Because M. was out of town, she

called Q. to pick them up while M. went to Q.'s house.  M. talked to G.G. sometime while

at Q.'s house but could not remember how the conversation came about.  M. testified that

the conversation may have occurred after they went to the hospital.  She recalled A.G.

telling G.G. it was OK to tell their grandmother what had happened, and G.G. telling her something like, "He hurt me. He hurt me with things. He put things in me. I told him to stop 'cause it hurt." 1 RP (June 10, 2021) at 147.

M. recalled the conversation lasting approximately five minutes. G.G. had never made statements like that before. M. did not provide any sexual terms or content to G.G. and did not recall A.G. doing so either. G.G. did not talk to her about what happened after that day, and M. did not feel it was right to ask him any questions about it.

*Detective Lamanna*

During Detective Lamanna's testimony, the court viewed the forensic interview with G.G. Detective Lamanna testified that he had allowed Q. to stay in the room during the forensic interview to "just kind of provide support." 1 RP (June 10, 2021) at 172. He noted that she had interjected at times, but she had not talked to G.G. about anything substantive to the investigation. Q. had not provided any sexual terms or content to G.G. Detective Lamanna had no concerns that G.G. was just repeating information back to him.

The State introduced into evidence G.G.'s drawing of the object Mr. Moore used and a photograph of the sex toy located in Mr. Moore's bedroom drawer. Detective

15

Lamanna testified that Mr. Moore's and G.G.'s deoxyribonucleic acid (DNA) was found on the sex toy.

*Court's ruling*

The trial court found G.G.'s hearsay statements were sufficiently reliable to be admitted. It discussed his history of lying and motive to lie about the abuse, noting that most of the reported lies were minor. The court acknowledged that the lies about G.G.'s uncle and the friend's wallet were a little more serious, but observed that all the lies "were more to shield him from consequences as opposed to using it as a sword to get other people in trouble." 1 RP (June 10, 2021) at 211.

The court discussed the defense's argument that Mr. Moore's style of discipline created resentment but contrasted the credible testimony about the good relationship between G.G. and Mr. Moore, pointing to G.G.'s own in-court testimony that he enjoyed playing Xbox with Mr. Moore. The court also observed: "[I]f somebody's using a lie as sort of a sword to get somebody else in trouble, they typically don't beg somebody else not to tell. And it was clear that there wasn't an understanding of what would happen if he did." 1 RP (June 10, 2021) at 211-12.

Discussing G.G.'s general character for truthfulness more, the court found it was important that G.G. had never lied about sexual abuse or other abuse before. It also

16

pointed to G.G.'s "consistent ability to correct, he sort of had a story and he was sticking to it and would clarify with Detective Lamanna when [the detective] got something wrong." 1 RP (June 10, 2021) at 212.

The court noted that more than one person had heard G.G.'s statements: "[T]here were consistent disclosures to his sister, to his aunt, to his grandmother, to law enforcement. And so this isn't kind of a one-time shot." 1 RP (June 10, 2021) at 213.

The court also found that G.G.'s statements were "spontaneous as opposed to being in response to anything suggestive." 1 RP (June 10, 2021) at 213. Nobody had suggested any sexual abuse or used sexual language when speaking with him. It noted that while A.G. had asked a somewhat leading question when she asked if anything else had happened, that was "fundamentally different than asking him, you know, did [Mr. Moore] sexually molest you or did [Mr. Moore] touch your privates or something like that." 1 RP (June 10, 2021) at 213. The court further observed that during the forensic interview, G.G.'s statements "were primarily narrative responses to open-ended questions. And, again, it was consistent with what he had previously disclosed to the other folks." 1 RP (June 10, 2021) at 213.

The court found that the timing of G.G.'s disclosures and his relationship to the witnesses suggested trustworthiness. G.G. had a close relationship to his sister, aunt, and

17

grandmother, and disclosed the abuse shortly after it occurred. The court acknowledged

case law that found disclosures to caregivers were not reliable because they were

predisposed to confirm their suspicions of abuse, but found that "there was no evidence

that there was any confirmation or strong suspicions that something was going on.

Nobody suspected anything." 1 RP (June 10, 2021) at 214.

The court observed that G.G.'s testimony was corroborated by other evidence.

Regarding the sex toy found in Mr. Moore's bedroom dresser drawer, the court noted:

> [I]t's a rather unique-looking sex toy, and the description of it matches quite
> well what was found.
> The circumstances that also give some reliability to that is the
> positional demonstration on the hospital bed. You've got the DNA on this
> very unique sex toy that was described and found in the dresser and
> [G.G.]'s reference to how he didn't see where [Mr. Moore] got it or put it
> back but he could hear drawers opening.
> There's also the—I think it was fairly uniform in the testimony about
> the other children being told to leave the house when [Mr. Moore] remained
> alone with [G.G.] Then [A.G.] testified to how one time when they were in
> the bedroom together, the TV was really, really loud and the door was
> locked. The description of how it felt to have that allegedly inserted into
> him was pretty descriptive.

1 RP (June 10, 2021) at 216.

The court concluded that, based on the totality of the circumstances, there was

sufficient indicia of reliability to admit G.G.'s hearsay statements. It entered written

findings of fact and conclusions of law that reflected and incorporated its oral ruling.

18

*Trial*

The case proceeded to a jury trial in June 2021. A.G., M.G., G.G., A., Q., and M.

testified consistent with their testimony at the child hearsay hearing. G.G. again could not

remember or refused to answer detailed questions about the abuse, and the jury was

played a redacted version of the forensic interview. We include further details of the trial

as relevant to this appeal.

*Motion for a new venire*

After voir dire began, Mr. Moore, who is Black, orally moved to strike the jury

panel. His counsel noted, "[L]ooking out into the panel yesterday, I didn't see a single

black juror at all amongst the, I think, 77 prospective jurors. I don't think we have . . . a

jury panel that accurately reflects a jury of Mr. Moore's peers." 1 RP (June 15, 2021) at

406. The court acknowledged the motion, but stated it did not want to "wing it" on the

issue and that they could address it further after completing individual voir dire.[4] 1 RP

(June 15, 2021) at 408.

During individual voir dire that day, juror 1 commented on the lack of diversity in

the jury panel. She noted that after the information was read, she first reacted to the

---

[4] Due to the nature of the charges, jurors were questioned individually about their
experiences with sexual assault and related issues.

charges and then "looked at the jury and maybe three of us were people of color." 1 RP (June 15, 2021) at 414. At the end of the first day, the court requested written briefing on the issue.

In his written motion, Mr. Moore argued that he was being deprived of his right to a trial by a jury of his peers. He noted that two percent of Spokane County's population was Black based on recent census data and that the absence of any Black person in the venire was not a fair and reasonable representation of the community. Mr. Moore acknowledged "it may be difficult to establish that the under representation of minorities was due to systematic exclusions," the disproportionality deprived him of a fair trial. CP at 148. He requested that the court release the current panel and "bring a new venire that better represents Mr. Moore's race." CP at 149.

The court reserved ruling on the motion to strike the venire until after voir dire was complete and they had an opportunity to talk to the panel. It pointed to juror 1's statement that there were only three people of color on the panel and noted it did not have an independent recollection of the jury panel's appearance.

During general voir dire, Mr. Moore's counsel engaged in a conversation about race and cultural issues. Juror 1, who was originally from Panama, described some ways being a person of color in Spokane affected her. Juror 7 expressed sadness that race was

even something they had to talk about: "We're all people. Inside it's not any different—just because the pigment in your skin is different doesn't make you different." 2 RP (June 16, 2021) at 793.

Juror 27 noted that the topic of race was "so complex," stating that he might "look like a typical white Spokanite," but had spent most of his adult life outside the country and did not speak English at home. 2 RP (June 16, 2021) at 793. When he spoke to his wife in a store in another language, people would look at them, but it did not necessarily mean people were judging them. He suggested that it may just be interesting to them, or "[m]aybe they're trying to figure out why I am not understanding what they're saying." 2 RP (June 16, 2021) at 794. He opined that "diversity is not skin deep." 2 RP (June 16, 2021) at 794.

Juror 46 acknowledged it could be scary to be judged by a jury composed entirely of persons of another race and questioned whether that would truly be a jury of one's peers. Juror 12 noted that while they might feel "inherently skeptical" of someone who looked different, "whether it's their color, their tattoos, their clothing," it was not necessarily important that they felt that, but rather whether they could overcome that feeling. 2 RP (June 16, 2021) at 796.

Mr. Moore's counsel turned to the issue of Mr. Moore's Islamic faith. Juror 2 stated he "totally believe[d]" that Muslims were subject to discrimination and had just recently watched videos showing people being harassed because they were Muslim. 2 RP (June 16, 2021) at 798. His defenses for Mr. Moore "went up when I heard that he was Muslim." 2 RP (June 16, 2021) at 798. He noted: "We don't have to experience what he experienced." 2 RP (June 16, 2021) at 798. Juror 11 countered that it was "critical that we don't take it either in a positive or negative sense, that we presume innocence and we evaluate all the evidence equally amidst all of that." 2 RP (June 16, 2021) at 799.

Juror 19 opined that a lot of the hate against Muslims was because "people still don't understand" the religion, comparing it to the prejudice against Catholics when John F. Kennedy was elected. 2 RP (June 16, 2021) at 800. Juror 35 stated religion did not matter to her because it was a personal choice, and she would not put her values on somebody else.

Juror 66 described her experience as a second-generation Norwegian American. Her sister married an Indian Muslim man and took his last name, Mohammed. Despite her sister being a "farm-fed white girl . . . the second she took his name . . . she experienced such prejudice and even almost racism toward her all of a sudden."

22

2 RP (June 16, 2021) at 802. She related that her sister's family had moved away from Spokane because of the racism they had faced in the area and her sister had changed her and their daughter's last name. She described the experience as "a massive eye-opener" and explained she felt "helpless" and "heartbroken" because of the discrimination. 2 RP (June 16, 2021) at 803.

After the conversations about race and religion, no juror expressed doubt that they could give Mr. Moore a fair trial.

After voir dire was complete, the court denied Mr. Moore's motion for a new venire. It noted that voir dire was "robust" and contained "one of the best conversations I've had in a voir dire panel about race and, frankly, religion as well." 2 RP (June 16, 2021) at 830-31. The court acknowledged defendants are entitled to have a jury that represents the community, but noted "[t]here's no right to a jury composed in whole or in part of persons of the defendant's own race." 2 RP (June 16, 2021) at 831. It opined that Mr. Moore was asking the court to go beyond the holding of any existing case law, and there was no guarantee that a new panel would include a Black person. It further concluded that Mr. Moore had not shown that the master jury list systematically excluded minorities, noting that Spokane's demographics were predominately Caucasian.

*Use of the term "rape kit"*

During opening argument, the prosecutor referred to G.G. being taken to the hospital so he "could receive a rape-kit examination." 2 RP (June 17, 2021) at 867. During questioning of medical experts, the State alternately used the term "rape kit" or "sexual assault kit" to refer to the evidence collection kit, as did the witnesses. Defense counsel referenced the evidence collection as a "rape kit" once during closing argument. There was no motion in limine to exclude the term "rape kit" and no objection to the use of the term "rape kit" at trial.

*Medical professionals' testimony*

The State called the emergency room physician who examined G.G. on July 5, 2019, Dr. Julie Phillips. She testified that she had performed between 10 and 15 pediatric sexual assault examinations, and it was common for her to find no injuries. During her examination of G.G., which included examination of his genitalia and anal region, she found no evidence of injury other than the bruise under his eye. The skin swabs she collected as part of her examination did not contain enough DNA to develop a DNA profile.

The State also called Teresa Forshag, a nurse practitioner who specialized in examining children where there were allegations of physical abuse, sexual abuse, or

neglect. Nurse Forshag had conducted approximately 2,000 sexual assault examinations of children. She testified it was "very common" to find no physical injury during an examination. 3 RP (June 21, 2021) at 1246. Many types of abuse do not leave lasting injuries and the mucous membrane tissue of the genitalia and anal area "heals super, super fast." 3 RP (June 21, 2021) at 1246. She testified: "What I explain to parents when I talk to them prior to examining the child is that the majority of time . . . these things that the child has said may well be true, but that doesn't mean that there will be physical findings." 3 RP (June 21, 2021) at 1246. She recalled occasions "where there's been penetration the day before, even a few hours before, and I'm not able to see anything on my external exam." 3 RP (June 21, 2021) at 1249. She had not examined G.G.

*Jury instructions and verdict*

Mr. Moore did not propose his own jury instructions or object to the State's proposed instructions. For each count of rape of a child in the first degree, the jury was instructed to determine "[w]hether the defendant knew or should have known that the victim was particularly vulnerable or incapable of resistance," and "[w]hether the crime was part of an ongoing pattern of sexual abuse of the same victim under the age of 18 years manifested by multiple incidents over a prolonged period of time." CP at 174-76. The jury was instructed to "consider each of the allegations separately." CP at 177.

25

During closing argument, the State argued that each count of rape of a child in the first degree represented a different type of penetration: "Count I for the times of oral rape, Count II for the rapes committed against [G.G.] with the defendant's penis, and Count III for the rapes committed with the sex toy."  3 RP (June 23, 2021) at 1425.

The defense argued in closing that G.G. had been coached into making the reports of abuse, pointing to the lack of physical findings of abuse.  Counsel acknowledged the State's testimony that the absence of injury is consistent with sexual assault but argued "the absence of injury is also consistent with no assault happening, probably more so." 3 RP (June 23, 2021) at 1472.

The jury found Mr. Moore guilty of counts 1 through 3, rape of a child in the first degree.  It returned special verdicts answering "yes" to both aggravating factors for each of the three counts.  It found Mr. Moore not guilty of fourth degree assault.

*Sentencing*

In his sentencing memorandum, Mr. Moore argued for a low-end standard range sentence.  He challenged the legal sufficiency of the pattern of abuse aggravator, arguing in part that the three acts of which he was convicted were the same acts that constituted a pattern of abuse.

At the sentencing hearing, the court questioned defense counsel on this argument, noting that each count was a category of sexual abuse, and G.G. had described multiple occasions of each type of abuse. Counsel argued there was not proof beyond a reasonable doubt of multiple incidents and questioned:

> What do we have in terms of what the jury relied upon to know whether or not they just said, Okay, well, there was three counts that are proven and that in and of itself is a pattern. Because if that's the finding that they made, that would be legally insufficient to be an aggravator . . . .

4 RP (Dec. 1, 2021) at 1539-40. The court rejected Mr. Moore's argument, noting that prior case law supported the validity of the pattern of abuse where there was evidence of multiple acts for each count.

Based on the aggravating factors, the court imposed an exceptional sentence upward of 360 months to life imprisonment. In its written findings and conclusions, the court concluded that the two aggravating factors, "whether considered individually or together, support the imposition of an exceptional sentence upward to 360 months in this case." CP at 291.

The court noted it would strike the standard condition that Mr. Moore pay supervision fees because it was making a finding of indigency. While it struck the condition in the section of the appendix containing mandatory conditions, it did not strike the corresponding condition in the judgment and sentence.

ANALYSIS

CHILD HEARSAY

Mr. Moore contends the trial court erred in admitting child hearsay. We disagree.

We review the trial court's decision to admit child hearsay for abuse of discretion. *State v. Beadle*, 173 Wn.2d 97, 112, 265 P.3d 863 (2011). A court abuses its discretion when its decision is made on untenable grounds or for untenable reasons or when its decision is manifestly unreasonable. *Id.* A decision is made on untenable grounds if "'the factual findings are unsupported by the record.'" *State v. Dye*, 178 Wn.2d 541, 548, 309 P.3d 1192 (2013) (quoting *In re Marriage of Littlefield*, 133 Wn.2d 39, 47, 940 P.2d 1362 (1997)). It is made for untenable reasons if it "is 'based on an incorrect standard or the facts do not meet the requirements of the correct standard.'" *Id.* (quoting *Littlefield*, 133 Wn.2d at 47). It is manifestly unreasonable if "it falls 'outside the range of acceptable choices, given the facts and the applicable legal standard.'" *Id.* (quoting *Littlefield*, 133 Wn.2d at 47).

Under RCW 9A.44.120(1)(a)(i), (b), a statement "made by a child when under the age of ten describing any act of sexual contact performed with or on the child by another"

28

is admissible in evidence if "the time, content, and circumstances of the statement provide sufficient indicia of reliability."[5]

Washington has identified a set of nonexclusive factors for a court to consider when determining the reliability of a child hearsay statement. The parties agree that the most relevant factors here are "'(1) whether there is an apparent motive to lie; (2) the general character of the declarant; (3) whether more than one person heard the statements; (4) whether the statements were made spontaneously; and (5) the timing of the declaration and the relationship between the declarant and the witness.'" *State v. Ryan*, 103 Wn.2d 165, 175-76, 691 P.2d 197 (1984) (quoting *State v. Parris*, 98 Wn.2d 140, 146, 654 P.2d 77 (1982)). No factor is essential and they must only be "substantially met." *State v. Swan*, 114 Wn.2d 613, 652, 790 P.2d 610 (1990).

While Mr. Moore acknowledges our review is for abuse of discretion, he fails to identify how the trial court's decision was based on untenable grounds, untenable reasons, or was manifestly unreasonable. Instead, he advocates for a wholesale reevaluation of the child hearsay issue, including considering arguments that were not made to the trial court.

---

[5] If the child is unavailable to testify, the statements must also be corroborated by "evidence of the act." RCW 9A.44.120(1)(c)(ii). While the trial court made findings about the corroboration of G.G.'s statements, they were not necessary where G.G. was available to testify at trial.

This we will not do. Our review is confined to assessing whether the trial court abused its discretion based on the evidence and arguments presented at trial and the trial court's unchallenged factual findings. Further, because Mr. Moore does not assign error to any of the trial court's findings of fact, they are verities on appeal. *State v. Escalante*, 195 Wn.2d 526, 531, 461 P.3d 1183 (2020).

*Motive to lie*

At trial, Mr. Moore argued G.G. was motivated to lie because G.G. resented the discipline Mr. Moore imposed. The trial court found this unconvincing, reasoning that G.G. appeared to have a good relationship with Mr. Moore and had never lied to get another person in trouble. These are tenable reasons to find that G.G. was not trying to get Mr. Moore in trouble and thus had no apparent motive to lie about the abuse.

On appeal, Mr. Moore argues that "the trial court ignored G.G.'s motive to say something that would persuade his sister to let him out" of his room. Reply Br. of Appellant at 3. This is false. Mr. Moore did not argue that G.G. was motivated to lie to be released from his room. The motive argued below was that G.G. sought to get Mr. Moore in trouble and halt his strict methods of discipline. The trial court cannot be said to ignore an argument that was never presented to it. Mr. Moore does not otherwise

identify how the trial court's reasoning was unsound and does not show how the court abused its discretion below.

*General character of G.G.*

The trial court acknowledged G.G.'s history of lying, but noted that his previous lies were to shield himself from consequences, and he had never lied about any kind of abuse. A lie about abuse would be out of character for G.G. The court further noted that G.G. consistently corrected the detective during the forensic interview when he misunderstood G.G. This showed that G.G. was not suggestible. These are tenable reasons for finding G.G.'s character supported the reliability of his statements.

On appeal, Mr. Moore argues that because G.G.'s motive to lie was to get himself out of confinement in his room, lying about abuse would actually be consistent with his past attempts to shield himself from consequences. This is again an argument that was never presented to the trial court, and the court did not abuse its discretion in failing to account for this theory.

*Whether more than one person heard the statements*

The trial court found that G.G. had made consistent statements to several people, which pointed toward reliability. Mr. Moore argues that analysis was incorrect, and the trial court should have considered only the initial disclosure, which was to one person.

31

He argues the presence of other people undermined the reliability of G.G.'s subsequent statements. We thus consider whether the trial court applied the wrong legal standard such that it abused its discretion.

While Mr. Moore contends the court may only consider whether more than one person heard the initial statement, he provides no authority establishing this. He cites cases in which the court ultimately found child hearsay unreliable, but those cases contain no individualized discussion of this factor. They merely state, with nearly identical language, that in the case before the court, only one person originally heard the statements, although subsequent repetitions of the statements were heard by others. *State v. Griffith*, 45 Wn. App. 728, 739, 727 P.2d 247 (1986) ("Third, only the mother originally heard this statement, although subsequent statements were heard by others."); *Ryan*, 103 Wn.2d at 176 ("Third, the initial statements of the children were made to one person, although subsequent repetitions were heard by others."). In neither case is there any indication of how the court weighed the multiple repetitions.

By contrast, case law clearly supports the trial court's position that multiple consistent statements to different individuals weighs in favor of reliability. *State v. Kennealy*, 151 Wn. App. 861, 883, 214 P.3d 200 (2009) ("[W]hen more than one person hears a similar story of abuse from a child, the hearsay statement is more reliable."); *see*

32

*also Swan*, 114 Wn.2d at 651; *State v. Leavitt*, 111 Wn.2d 66, 74-75, 758 P.2d 982

(1988); *State v. Bailey*, 52 Wn. App. 42, 49, 757 P.2d 541 (1988), *aff'd*, 114 Wn.2d 340,

787 P.2d 1378 (1990).

The trial court did not employ the wrong legal standard when it concluded G.G.'s

consistent statements to multiple people were an indication of reliability and thus the

court did not abuse its discretion.

*Whether the statements were made spontaneously*

The trial court found that G.G. made the statements spontaneously rather than in

response to anything suggestive and that nobody suggested any sexual abuse or used any

sexual terms when speaking with G.G.  On appeal, Mr. Moore argues that G.G.'s

statements were not spontaneous because Q. nodded during the forensic interview and

interjected at times.  We disagree.

The trial court's findings were supported by substantial evidence.  G.G. faced

away from Q. for most of the forensic interview.  When she nodded, it was largely

directed toward confirming biographical details to Detective Lamanna and was out of

G.G.'s eyesight.  For example, in the first several minutes, Q. nods or shakes her head to

indicate G.G. is good at math, does not play sports, has a Minecraft LEGO® set, has

known Mr. Moore his whole life, and to confirm the names of G.G.'s siblings and

stepsiblings. She interjects only to supply similarly innocuous information, such as the words for sleeping mask, selfie stick, and necktie. The only time Q. nods within G.G.'s eyesight while he discusses abuse is for approximately 15 seconds while G.G. describes Mr. Moore ejaculating on his face and making him shower. The remainder of G.G.'s detailed statements and physical demonstrations were made without any input from Q. The record amply supports the court's finding that G.G.'s statements were spontaneous.

*Timing of the declaration and the relationship between the G.G. and the witness*

The trial court found G.G.'s statements were more reliable because they were made close in time to the abuse, and they were made to family members with whom he had a close relationship. Mr. Moore contends on appeal that the timing of G.G.'s statements to A.G. and his relationship with Q. and M. undermines the reliability of G.G.'s statements.

Regarding timing, Mr. Moore again points to the theory, never raised before the trial court, that G.G. was motivated to fabricate allegations of abuse so that his sister would release him from his room. He argues that the timing of G.G.'s statements, coming after a period of punishment, suggests G.G. had an incentive to lie. This argument is properly directed toward G.G.'s motive to lie, not the timing of the disclosure, as identified in Mr. Moore's cited authority. *See In re Dependency of A.E.P.*, 135 Wn.2d

208, 228-29, 956 P.2d 297 (1998).  We have already concluded the trial court did not

abuse its discretion in finding that G.G. had no apparent motive to lie.  Mr. Moore does

not identify any way in which the trial court abused its discretion in reasoning that the

short period of time between the abuse and G.G.'s disclosures weighed in favor of

reliability.

Regarding G.G.'s relationship with the witnesses, Mr. Moore contends that the

close relationship between G.G. and his aunt and grandmother made Q. and M.

predisposed to confirm sexual abuse rather than to stay objective.  Mr. Moore does not,

however, challenge the trial court's finding that there was no evidence of confirmation

bias and that "[n]obody suspected anything."  1 RP (June 10, 2021) at 214.  While he

argues the finding was not supported by substantial evidence, he does not identify any

evidence there *was* confirmation bias that the trial court overlooked.

Mr. Moore additionally contends that Q.'s confirmation bias tainted Detective

Lamanna's interview with G.G.  As discussed above, this argument contradicts the trial

court's findings that G.G.'s statements in the interview were spontaneous, that no one

suggested abuse to G.G., and that G.G. at times corrected the detective's statements.  Mr.

Moore does not demonstrate that the trial court abused its discretion in finding that the

timing of the disclosure and G.G.'s relationship with the witnesses weighed toward reliability.

We conclude that Mr. Moore fails to show the trial court abused its discretion in considering any single factor or in concluding that under the totality of the circumstances, there were sufficient indicia of reliability surrounding G.G.'s statements to admit the child hearsay under RCW 9A.44.120.

APPEARANCE OF FAIRNESS IN THE TRIBUNAL

Mr. Moore contends his due process right to a fair trial was violated by the lack of any Black person on the venire. This argument is novel, is markedly different than the one he raised below, and we decline to review it.

Toward the end of voir dire, Mr. Moore submitted a memorandum supporting his request for a new venire. The memorandum reflects that his request was based on the right in criminal proceedings to have an impartial jury, as guaranteed by article I, section 22 of the Washington Constitution and the Sixth Amendment to the United States Constitution. Specifically, his request was made under the three-part test articulated in *State v. Cienfuegos*:

> The burden of proof is on the challenger to show the master jury list is not representative, excluding an identifiable population group. Under the federal constitution . . . the petitioner must show "(1) that the group alleged to be excluded is a 'distinctive' group in the community; (2) that the

36

representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this under representation is due to systematic exclusion of the group in the jury-selection process."

144 Wn.2d 222, 231-32, 25 P.3d 1011 (2001) (citation omitted) (quoting *Duren v. Missouri*, 439 U.S. 357, 364, 99 S. Ct. 664, 58 L. Ed. 2d 579 (1979)).

On appeal, Mr. Moore abandons his Sixth Amendment argument, likely because he cannot establish the third part of the three-part test. He instead raises a novel due process "appearance of fairness" argument and cobbles together cases discussing limitations on removing jurors of color from the venire rather than cases discussing the initial composition of the venire. His apparent motive for doing this is to avoid the necessity of showing that the lack of any Black person on his venire was due to systematic exclusion.

We generally decline to review claims of error raised for the first time on appeal. RAP 2.5(a). One exception, however, is for a "manifest error affecting a constitutional right." RAP 2.5(a)(3). "To meet RAP 2.5(a) and raise an error for the first time on appeal, an appellant must demonstrate (1) the error is manifest and (2) the error is truly of constitutional dimension." *State v. O'Hara*, 167 Wn.2d 91, 98, 217 P.3d 756 (2009).

To show the error is manifest, an appellant must show "'the asserted error had practical and identifiable consequences in the trial of the case.'" *Id.* at 99 (quoting *State v. Kirkman*, 159 Wn.2d 918, 935, 155 P.3d 125 (2007)). To have practical and

identifiable consequences, the claimed error must be "so obvious on the record that the

error warrants appellate review." *Id.* at 100. We do not "address claims where the trial

court could not have foreseen the potential error." *Id.*

Applying these principles, we conclude that Mr. Moore's new argument does not

raise a claim of manifest error. The trial court could not have foreseen the application of

a test not yet adopted, a test that omits the third part of the three-part test discussed in

*Cienfuegos*.

USE OF THE TERM "RAPE KIT" AND MEDICAL TESTIMONY

Mr. Moore raises several interrelated claims of error relating to the use of the term

"rape kit" and the medical professionals' testimony at trial. None of the claimed errors

were raised below. To the extent they are properly before us, we reject his claims.

*Opinion testimony*

Mr. Moore contends that various medical professionals offered improper opinion

testimony at trial. Witnesses may not give an opinion on a defendant's guilt, either

directly or by inference. *State v. Black*, 109 Wn.2d 336, 348, 745 P.2d 12 (1987). Nor

may a witness give an opinion on another witness's credibility. *State v. Carlson*, 80 Wn.

App. 116, 123, 906 P.2d 999 (1995). Doing so invades the exclusive province of the jury.

*Black*, 109 Wn.2d at 348. Improper opinion testimony can be raised for the first time on

appeal when it is a manifest constitutional error; however, such an error must be "an explicit or almost explicit witness statement on an ultimate issue of fact." *Kirkman*, 159 Wn.2d at 938.

Mr. Moore objects to testimony from Nurse Forshag and Dr. Phillips that it is common for children to have no physical injury in sexual assault examinations. He further objects to Nurse Forshag's testimony that she tells parents a child's allegations "may well be true" despite there being no physical findings and that she has examined children shortly after penetration and been unable to find any injury on an external exam. 3 RP (June 21, 2021) at 1246. Mr. Moore argues this testimony "conflated the allegation of rape with the fact of rape." Br. of Appellant at 44.

Mr. Moore's argument is difficult to parse. The testimony to which he objects does not contain any explicit or almost explicit opinion on an ultimate issue of fact. While the witnesses testified it was common for a victim of abuse to have no physical signs, they did not offer any opinion as to whether G.G. had been abused or whether he was being truthful in disclosing abuse. The witnesses' testimony potentially lacked foundation about how they knew an assault occurred in cases where there was no physical evidence, but a lack of foundation does not transform their testimony into an improper opinion. It transforms it into speculation, which is an evidentiary issue for which an

objection is necessary, not a constitutional violation. *See* ER 703; *State v. Powell*, 166

Wn.2d 73, 82, 206 P.3d 321 (2009). Because Mr. Moore fails to identify any opinion

testimony from the medical professionals, the alleged error is not a manifest constitutional

error, and we decline to review it.

Mr. Moore similarly contends that the use of the term "rape kit" by witnesses

was improper opinion testimony, pointing to two instances in which medical

professionals used the term. He offers no argument in support of his claim that the use of

the term by witnesses constituted opinion testimony, and we again decline to review it.

*See* RAP 10.3(a)(6); *Brownfield v. City of Yakima*, 178 Wn. App. 850, 876, 316 P.3d 520

(2014).

*Prosecutorial misconduct*

Mr. Moore argues the prosecutor's use of the term "rape kit" was improper

prosecutorial vouching because the phrase "entails an assumption that a rape has

occurred." Br. of Appellant at 34. Prosecutors may not comment on the credibility of a

witness or the guilt of the accused. *State v. Lindsay*, 180 Wn.2d 423, 437, 326 P.3d 125

(2014). Where no objection to a prosecutor's statements is made at trial, however, on

appeal, the defendant must show the prosecutor's misconduct was "'so flagrant and ill-

intentioned that it cause[d] an enduring and resulting prejudice that could not have been

neutralized by a curative instruction.'" *In re Pers. Restraint of Phelps*, 190 Wn.2d 155,

165, 410 P.3d 1142 (2018) (alteration in original) (internal quotation marks omitted)

(quoting *In re Pers. Restraint of Lui*, 188 Wn.2d 525, 539, 397 P.3d 90 (2017)).

Mr. Moore first argues the phrase "rape kit" is inherently inflammatory and

prejudicial.[6] To the extent the word "rape" itself is inflammatory, however, it is

inescapable in a trial for rape of a child in the first degree. Indeed, the jurors' first

introduction to the case was the reading of the information, which included three counts

of rape. Until the legislature sees fit to rename the crime, the prosecutor's continued use

of the word "rape" during trial is not inherently inflammatory or prejudicial.

Mr. Moore next argues that where the only question at trial was whether a crime

had been committed at all, the use of the term "rape kit," "suffuse[d] the trial" with the

prosecutor's personal opinion that the defendant was guilty. Br. of Appellant at 39. We

are unconvinced, especially given the fact that the "rape kit" found no evidence of rape.

*Ineffective assistance of counsel*

Mr. Moore finally argues counsel was constitutionally ineffective for failing to

object to the use of the term "rape kit." We review a claim of ineffective assistance of

---

[6] Mr. Moore relies on several unpublished, out-of-state cases for this proposition. To the extent those cases have any persuasive value, *see* GR 14.1(b), they do not support his argument, as none found reversible error at trial.

counsel de novo. *State v. Estes*, 188 Wn.2d 450, 457, 395 P.3d 1045 (2017). To prevail

on an ineffective assistance claim, the defendant must meet the two-pronged *Strickland*[7]

test and show (1) defense counsel's representation was deficient and (2) the deficient

representation prejudiced the defendant. *Id.* at 457-58.

"Deficient performance is performance falling 'below an objective standard of

reasonableness based on consideration of all the circumstances.'" *State v. Kyllo*, 166

Wn.2d 856, 862, 215 P.3d 177 (2009) (quoting *State v. McFarland*, 127 Wn.2d 322,

334-35, 899 P.2d 1251 (1995)). A reviewing court starts from "a strong presumption that

counsel's performance was reasonable." *Id.* "If a defendant centers their claim of

ineffective assistance of counsel on their attorney's failure to object, then 'the defendant

must show that the objection would likely have succeeded.'" *State v. Vazquez*, 198

Wn.2d 239, 248, 494 P.3d 424 (2021) (quoting *State v. Crow*, 8 Wn. App. 2d 480, 508,

438 P.3d 541 (2019)). If counsel's performance was deficient, a defendant must also

show there was a reasonable probability of a different outcome had counsel's

performance been adequate. *Id.*

Mr. Moore argues counsel's performance was deficient for failing to object to the

use of the term "rape kit" because the phrase is "inflammatory and damaging" and there

---

[7] *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984).

was no strategic reason to "undermin[e] the presumption of innocence" by referring to the evidence collection process as a "rape kit." Br. of Appellant at 47. We disagree. Mr. Moore was charged with three counts of rape of a child. The so-called "rape kit" produced no physical evidence of abuse. While the State established through expert testimony that it is common to find no physical evidence in child sex abuse cases, the lack of physical evidence nonetheless supported Mr. Moore's defense that the abuse did not occur. Counsel was objectively reasonable in allowing references to a "rape kit" where the rape kit arguably showed that no rape—the charged crime—occurred. Indeed, counsel used the evidence to Mr. Moore's advantage during closing argument.

Mr. Moore similarly cannot show that the use of the term "rape kit" prejudiced him. As discussed above, the term is not inherently inflammatory where it is already an inescapable part of the trial. And again, because the evidence arguably *supported* Mr. Moore's defense that no rape occurred, referring to the evidence collection kit as a "rape kit" did not prejudice him at trial.

We decline to review Mr. Moore's claims regarding the medical professionals' testimony. He fails to demonstrate the prosecutor committed misconduct in using the term "rape kit" or that counsel was ineffective for failing to object to the term.

43

EXCEPTIONAL SENTENCE

Mr. Moore contends the trial court erred in imposing an exceptional sentence based on the pattern of abuse aggravating factor where that factor inheres in the elements of the convictions.

An exceptional sentence may not be based on factors necessarily considered by the legislature in setting the standard sentencing range for a crime. *See State v. Ferguson*, 142 Wn.2d 631, 649, 15 P.3d 1271 (2001). Thus, if each act forming the pattern of abuse led to a separate conviction, the pattern of abuse aggravator cannot be applied because the legislature accounted for the multiple acts in the offender score. *State v. Fisher*, 108 Wn.2d 419, 425-26, 739 P.2d 683 (1987). On the other hand, the pattern of abuse aggravator "can be applied even though the defendant was convicted on multiple counts if each count was based on multiple acts of sexual abuse." 13B SETH A. FINE, WASHINGTON PRACTICE: CRIMINAL LAW AND SENTENCING § 47:9, at 648 (3d ed. 2019) (citing *State v. Brown*, 55 Wn. App. 738, 755-56, 780 P.2d 880 (1989)).

Mr. Moore does not argue that the enhancement is legally unavailable or that the evidence was insufficient to support the enhancement. He argues that it is impossible to know whether the jury relied on the same three rapes of which it convicted him to find the pattern of abuse because the jury "was not instructed that it could not find an

44

aggravating factor based on the same acts underlying the guilty verdicts on each count of rape of a child." Br. of Appellant at 66. This is therefore a challenge to the jury instructions—which Mr. Moore has not preserved.

CrR 6.15(c) requires parties to timely object to faulty jury instructions so that the trial court may correct any errors before instructing the jury. A failure to timely object generally waives any claim of error. *See State v. Schaler*, 169 Wn.2d 274, 284, 236 P.3d 858 (2010). Mr. Moore did not propose his own jury instructions or object to the State's proposed jury instructions on the aggravating factors. He provides no argument for why we should review this claim for the first time on appeal, and we decline to do so. *See* RAP 2.5(a).

Further, any error in applying the pattern of abuse aggravator was harmless. Even if we find an aggravating factor invalid, we can affirm an exceptional sentence where we are "satisfied that the trial court would have imposed the same sentence based upon a factor or factors that are upheld." *State v. Jackson*, 150 Wn.2d 251, 276, 76 P.3d 217 (2003). Such is the case here. The trial court concluded that each aggravator, "considered individually or together, support[ed] the imposition of an exceptional sentence upward to 360 months." CP at 291. We are satisfied that had the court considered the particularly vulnerable victim aggravator "individually," it would have

imposed the same sentence of 360 months. *See State v. Cardenas*, 129 Wn.2d 1, 12, 914 P.2d 57 (1996) ("Here, the trial court specifically stated . . . that any of the factors standing alone would be a substantial and compelling factor justifying the exceptional sentence.").

Mr. Moore points to an instance in which we remanded for resentencing where the trial court said only that each aggravating factor "independently provided authority to order the exceptional sentence," and we would be forced to speculate on whether the trial court would have imposed the same sentence. *State v. Weller*, 185 Wn. App. 913, 930, 344 P.3d 695 (2015). Here, we need not speculate. The trial court did not simply conclude that it had authority to impose an exceptional sentence based on each individual aggravating factor, it concluded that each factor actually supported a sentence of 360 months. Resentencing is not necessary.

SUPERVISION FEES

Mr. Moore contends there is a scrivener's error in his judgment and sentence regarding payment of supervision fees. The State concedes error, and we agree.

"A scrivener's error is a clerical mistake that, when amended, would correctly convey the trial court's intention based on other evidence." *State v. Wemhoff*, 24 Wn. App. 2d 198, 202, 519 P.3d 297 (2022). The trial court clearly expressed its intention to

46

waive supervision fees, stating its intention to do so, and striking the requirement from the appendix containing community custody conditions. Further, the legislature has since removed the trial court's ability to order payment of supervision fees, a change that Mr. Moore may take advantage of because his conviction is not yet final. *See id.* We therefore remand for the limited purpose of striking the supervision fee requirement from Mr. Moore's judgment and sentence.

Affirmed, but remanded for correction of judgment and sentence.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Lawrence-Berrey, J.

WE CONCUR:

_____     _____
Fearing, C.J.                            Pennell, J.